**TEXAS MUTUAL INSURANCE COMPANY, Petitioner,**

v.

**Timothy J. RUTTIGER, Respondent.**

No. 08–0751.

Supreme Court of Texas.

Argued April 14, 2010.

Rehearing Granted Feb. 17, 2012.

Decided June 22, 2012.

Rehearing Denied Sept. 21, 2012.

P.M. Schenkkan, Mary A. Keeney, Matthew B. Baumgartner, James Alan Hemphill, William Gerow Christian, Boyce C. Cabaniss, Graves Dougherty Hearon & Moody, P.C., Mary Barrow Nichols, Shannon Simmons Pounds, Texas Mutual Insurance Co., Austin, TX, Murry B. Cohen, Akin Gump Strauss Hauer & Feld LLP, J. Stephen Barrick, Hicks Thomas LLP, Houston, TX, Dan Pozza, Law Offices of Dan Pozza, San Antonio, TX, for Texas Mutual Insurance Company.

Byron C. Keeling, Ruth B. Downes, Keeling & Downes, P.C., Michael P. Doyle, Jeffrey L. Raizner, Doyle Raizner LLP, Houston, TX, for Timothy J. Ruttiger.

Thomas R. Phillips, Baker Botts L.L.P., Austin, TX, for Amicus Curiae Liberty Insurance Corporation.

Peter N. Rogers, Rogers Booker & Lewis PC, Richardson, TX, for Amicus Curiae Peter N. Rogers.

Joe K. Longley, Law Offices of Joe K. Longley, Austin, TX, for Amicus Curiae Joe K. Longley.

George (Tex) Quesada, Sommerman & Quesada, L.L.P., Dallas, TX, Peter M. Kelly, Kelly Durham & Pittard LLP, Houston, TX, for Amicus Curiae Texas Trial Lawyers Association.

Thomas R. Phillips, Baker Botts L.L.P., Austin, TX, for Amicus Curiae The American Insurance Association.

Justice JOHNSON delivered the opinion of the Court, in which Justice HECHT, Justice WAINWRIGHT, Justice WILLETT, and Justice GUZMAN joined.

We grant the parties' motions for rehearing. We withdraw our opinion of August 26, 2011, and substitute the following in its place.

In 1989 the Legislature enacted major amendments to the Workers' Compensation Act (Act). TEX. LAB.CODE §§ 401.001–506.002. The amendments included significant reforms, among which were changes in how to calculate income benefits for injured workers, the amount of income benefits workers could recover, the dispute resolution process, the addition of an ombudsman program to provide assistance for injured workers who had disputes with insurers, and increasing sanctions for violations of the Act. In this case, the issues presented involve, among other matters, (1) the interaction of the current Act with the Insurance Code and the Deceptive Trade Practices Act (DTPA), and (2) whether the 1989 restructuring of the Act and subsequent amendments obviate the need we found in *Aranda v. Insurance Co. of North America,* 748 S.W.2d 210 (Tex. 1988) to engraft an extra-statutory cause of action for breach of the duty of good faith and fair dealing onto the workers' compensation system.

We conclude that (1) claims against workers' compensation insurers for unfair settlement practices may not be made under the Insurance Code, but (2) claims under the Insurance Code may be made against those insurers for misrepresenting provisions of their policies, although in this case there was no evidence the insurer did so.

We also overrule *Aranda,* 748 S.W.2d 210. We hold that an injured employee may not assert a common-law claim for breach of the duty of good faith and fair dealing against a workers' compensation carrier.

We reverse the judgment of the court of appeals and render judgment for Texas Mutual Insurance Company.

## I. Background

On June 21, 2004, Timothy Ruttiger was working for A & H Electric in Galveston when he reported to his supervisor that he was injured while carrying pipe. He went to the University of Texas Medical Branch at Galveston where he was diagnosed as having bilateral inguinal hernias. Later that day he went to A & H's office and filled out a TWCC–1 form, reporting that he had been injured on the job. *See* TEX. LAB.CODE § 409.001. Ruttiger was scheduled for hernia repair surgery to be performed on July 14, 2004.

When A & H's workers' compensation carrier, Texas Mutual Insurance Company (TMIC), received written notice that Ruttiger was claiming an injury, it initiated temporary income benefit payments and began investigating. As part of the investigation process, TMIC's adjuster, Audie Culbert, interviewed A & H employees. One employee told Culbert that Ruttiger had been at a softball tournament the weekend before the alleged injury and had come to work on the morning of the incident with a limp. She later reported that one of Ruttiger's co-workers informed her Ruttiger was injured at the softball game and "bragged about getting it paid by workers' comp." The vice president of A & H said that Ruttiger "wasn't 100 percent" when he arrived at work on the day of the incident and he "never got a straight story" on how Ruttiger was injured. Culbert testified at trial that he attempted to contact Ruttiger by telephone and by mail, but was unable to do so. Ruttiger denied receiving a letter or phone call from TMIC.

On July 11, Ruttiger's doctor notified him that TMIC refused to pay for the hernia surgery. Ruttiger testified that he then called Culbert who told him the claim was denied because the hernias resulted from Ruttiger's playing softball and were not work related.

On July 12, 2004, TMIC filed a "Notice of Refused or Disputed Claim" with the Texas Workers' Compensation Commission [1] and discontinued temporary income benefit payments after having sent one check. *See id.* § 409.021 (providing that a carrier commits an administrative violation if it does not, no later than the 15th day after the carrier receives written notice of an injury, either begin paying benefits or notify the WCD and the employee of its refusal to pay as well as notifying the employee of (1) his right to request a benefit review conference and (2) the means to obtain further information).[2] In its notice, TMIC stated that its investigation revealed Ruttiger sustained the hernias while he was playing softball and that it "disput[ed] this claim in its entirety." *See id.* § 409.022 (providing that an insurer's notice of refusal to pay benefits must specify the grounds for the refusal, that absent new evidence such grounds are the only basis on which the carrier may dispute compensability in a later proceeding, and failure to comply with such requirements is an administrative violation). The notice included the WCD's telephone number and a statement that an injured worker whose claim was denied had the right to contact the Division to request a benefit review conference (BRC). *See id.* § 409.021(a)(2).

Two days after he was notified that TMIC refused to pay for his surgery, Ruttiger hired a lawyer to help with his claim. Approximately two months later, in September, Ruttiger's lawyer contacted TMIC and asked for a copy of the notice of disputed claim. After another month, on October 22, 2004, Ruttiger's lawyer requested the WCD to set a BRC. *See id.* § 410.021 (providing that a BRC is a non-adversarial, informal dispute resolution proceeding designed, among other things, to mediate and resolve disputed issues). The BRC was set for December 2, 2004. *See id.* § 410.025(a); 28 TEX. ADMIN. CODE § 141.1 (providing that a BRC must be set within forty days after the request is received, but in cases warranting expedited processing, the BRC must be set within twenty days). The WCD failed to notify TMIC of the setting so the conference was rescheduled for January 6, 2005. At the January conference, Ruttiger and TMIC entered into a benefit dispute agreement. They agreed that (1) Ruttiger suffered a compensable injury on June 21, 2004; (2) he did not have disability from June 22, 2004 through August 22, 2004; and (3) he

---

1. In 2005, the Legislature abolished the Texas Workers' Compensation Commission and transferred its functions to the Texas Department of Insurance, Workers' Compensation Division. *See* Act of May 29, 2005, 70th Leg., R.A., ch. 265, § 8.001, 2005 Tex. Gen. Laws 469, 607–08. For ease of reference we will refer to the Division, or "WCD" instead of the Commission.

2. When TMIC received notice of Ruttiger's claim, it was required to notify the WCD of the claim. TEX. LAB.CODE § 409.005. The WCD was then required to notify Ruttiger of the Act's benefits and procedures:

    **Plain Language Information; Notification of Injured Employee**
    (a) The division shall develop information for public dissemination about the benefit

process and the compensation procedures established under this chapter. The information must be written in plain language and must be available in English and Spanish.
(b) On receipt of a report [of injury], the division shall contact the affected employee by mail or by telephone and shall provide the information required under Subsection (a) to that employee, together with any other information that may be prepared by the office of injured employee counsel or the division for public dissemination that relates to the employee's situation, such as information relating to back injuries or occupational diseases.
*Id.* § 409.013.

had disability from August 23, 2004 "to the present." The WCD approved the agreement. Following the BRC, TMIC paid temporary income benefits for the agreed period of past disability and re-initiated weekly benefits. *See* Tex. Lab.Code § 408.101. TMIC also paid for Ruttiger's surgery and other medical expenses related to his hernias. Ruttiger reached maximum medical improvement on August 1, 2005, and was assigned a 1% impairment rating. *See id.* §§ 408.121–.122.

On June 16, 2005, while his claim was still pending before the WCD and before he had reached maximum medical improvement, Ruttiger sued TMIC and Culbert (generally referred to collectively as TMIC) for violations of article 21.21 of the Insurance Code,[3] breach of the common law duty of good faith and fair dealing, and violations of the DTPA. Tex. Bus. & Comm. Code §§ 17.41–.63. Ruttiger did not claim that TMIC failed to fulfill the agreement it entered into at the BRC or that TMIC did not properly pay income and medical benefits after the BRC. Rather, he claimed that TMIC's delay in paying temporary income benefits and agreeing to pay for surgery until January 2005 damaged his credit, worsened his hernias, and caused mental anguish, physical impairment, and pain and suffering over and above what he would have suffered if TMIC had timely accepted liability and provided benefits. His allegations as to Insurance Code violations were that TMIC (1) failed to adopt and implement reasonable standards for promptly investigating claims, (2) refused to pay Ruttiger's claim without having conducted a reasonable investigation, (3) failed to promptly provide a reasonable explanation for denying his claim, (4) failed

to attempt to promptly and fairly settle the claim when liability was reasonably clear, and (5) misrepresented the insurance policy to him. He also asserted that TMIC's Insurance Code violations authorized recovery under the DTPA. Ruttiger's common law claim was that TMIC breached its duty to properly investigate his claim and denied necessary medical care and other benefits.

The case was tried to a jury, which found that TMIC (1) breached its duty of good faith and fair dealing, (2) committed unfair and deceptive acts or practices that were a producing cause of damages to Ruttiger, and (3) engaged in the unfair and deceptive acts knowingly. The jury found damages for past physical impairment, past and future pain and suffering, past and future loss of credit, past mental anguish, "additional" damages, and attorneys' fees. The trial court rendered judgment based on the Insurance Code findings, but also provided in its judgment that if the Insurance Code theory of liability failed on appeal, Ruttiger was entitled to recover for TMIC's breach of the duty of good faith and fair dealing and under the DTPA.

The court of appeals held that there was no evidence of credit reputation damages, but otherwise affirmed the trial court's judgment allowing recovery under the Insurance Code. 265 S.W.3d 651, 672. The appeals court did not reach the issues of whether Ruttiger could recover under his DTPA or common law claims. We granted TMIC's petition for review. 53 Tex. Sup.Ct.J. 388 (Mar. 15, 2010).

TMIC makes several arguments for reversing the court of appeals' judgment: (1) Ruttiger is not entitled to recover for ag-

---

**3.** Ruttiger's pleadings referenced article 21.21 of the Insurance Code. In 2003 the Legislature recodified the Insurance Code and article 21.21 provisions relevant to this matter were placed in Chapter 541. Further reference to Insurance Code provisions will be to the recodified designations.

gravation of his hernias due to delay in surgery because a worker may only recover for a common law bad faith claim if he suffers an "independent injury" separate from his compensation injury; (2) the trial court lacked jurisdiction to award bad faith damages for wrongful delay of benefits because Ruttiger did not exhaust his administrative remedies by obtaining a determination by the WCD that benefits were due; (3) the Insurance Code causes of action do not apply to Ruttiger's claims as a matter of law, and even if they do, there is no evidence to support the jury findings that TMIC violated the Code's provisions; (4) even if Ruttiger's injuries were independent and the trial court had jurisdiction over his claims, this Court should join the majority of states that have considered the issue and disallow common law bad faith claims in the context of workers' compensation; (5) the court of appeals misapplied insurance claims-handling standards for liability and no-evidence appellate review when it held that jurors may disregard conflicting evidence of coverage such as exists here where the statements made by employees of A & H and medical records indicated Ruttiger's hernias were preexisting;[4] (6) there is no evidence that TMIC knowingly violated the Insurance Code because there is no evidence it was actually aware it was being unfair to Ruttiger; and (7) there is no evidence to support the award for mental anguish damages.[5]

In response, Ruttiger argues that (1) a claim for aggravation of his hernias is sep-arate from his workers' compensation claim; (2) he exhausted his administrative remedies by requesting and attending a BRC where he entered into a benefit dispute agreement with TMIC; (3) claims under the Insurance Code are allowed in the context of the workers' compensation scheme; and (4) the jury findings are supported by legally sufficient evidence.[6]

We begin by considering TMIC's assertion that the trial court lacked jurisdiction because Ruttiger failed to exhaust his administrative remedies.

## II.   Exhaustion of Administrative Remedies

■   Citing *American Motorists Ins. Co. v. Fodge*, 63 S.W.3d 801 (Tex.2001), TMIC asserts that a trial court lacks jurisdiction over a workers' compensation claims-handling suit unless the WCD has made a determination that the worker is entitled to the specific benefits wrongly denied or delayed.   TMIC argues that in this case the WCD has not done so.

Ruttiger and TMIC attended a BRC and entered into a benefit dispute agreement in which the parties agreed that Ruttiger sustained a compensable injury and had disability beginning August 23, 2004.   The WCD approved the agreement.   TMIC asserts that this agreement was not a WCD determination sufficient to give the trial court jurisdiction.   Ruttiger counters that because at the time he filed this suit there were no disputed issues to be resolved by

---

**4.**   Medical records obtained during lawsuit discovery revealed that Ruttiger had been diagnosed as having bilateral inguinal hernias on two different occasions before he began working for A & H.   He denied knowing of the diagnoses and denied having hernias before he was injured on June 21, 2004.

**5.**   Amicus briefs were submitted in support of TMIC's position by Liberty Insurance Corpo-

ration, the American Insurance Association, and the Property Casualty Insurers Association of America.

**6.**   Amicus briefs were submitted in support of Ruttiger's position by the Texas Trial Lawyers' Association, attorney Peter N. Rogers, and attorney Joe K. Longley.

the WCD, he was not required to continue through the administrative process. We agree with Ruttiger that the trial court had jurisdiction.

As the court of appeals pointed out, the Act provides a dispute resolution process consisting of four possible steps. 265 S.W.3d at 657. Those steps are a BRC, a contested case hearing (CCH), review by an administrative appeals panel, and judicial review. TEX. LAB.CODE §§ 410.021, 410.151, 410.202, 410.251. A claimant is not required to continue through every step; the provisions of the Act contemplate that disputes may be resolved at any level. *See id.* § 410.025(b) (providing that the WCD shall schedule a CCH "to be held not later than the 60th day after the date of the benefit review conference if the disputed issues are not resolved at the benefit review conference"); *id.* § 410.029 ("[A] dispute may be resolved either in whole or in part at a benefit review conference."); *id.* § 410.169 (providing that the decision of a CCH officer is final in the absence of an appeal).

Here, the parties entered into a benefit dispute agreement at the first BRC held in January 2005. The agreement stated that it resolved the issues in dispute and it was signed by Ruttiger, his attorney, and a representative of TMIC. The agreement was binding on both parties "through the conclusion of all matters relating to the claim" absent circumstances not involved here. *Id.* § 410.030. The agreement was approved by the WCD and was a sufficient resolution of Ruttiger's claim by the WCD

to constitute exhaustion of his administrative remedies as to whether he suffered an injury in the course of his employment for which medical and income benefits were payable, and as to the date when he became disabled from the injury.

TMIC also asserts that under *Fodge* Ruttiger was required to obtain a determination from the Division that he was entitled to the specific benefits he claims he was wrongly denied. In *Fodge*, a CCH officer concluded that Anne Fodge had suffered a compensable injury. 63 S.W.3d at 802. She did not claim medical benefits or claim that the carrier, American Motorists Insurance Co., had denied medical benefits. *Id.* Five months later she filed suit against American Motorists for mishandling her claim by, among other things, denying and delaying payment for medical treatment. *Id.* We noted that only the WCD can determine whether a claimant is entitled to particular benefits, and held that just as a trial court could not award medical benefits, neither could it award damages for a denial of payment of benefits without a determination that the benefits were due. *Id.* at 804.

Ruttiger exhausted his administrative remedies as to his claims that TMIC delayed in paying income benefits and the Commission's approval of the benefit dispute agreement was a determination of specific dates for which income benefits were payable. Accordingly, the trial court had jurisdiction over the claims for delayed payment of income benefits.[7]

---

7. TMIC asserts that in this case the benefit dispute agreement addressed whether Ruttiger sustained a compensable injury and had a disability, but it did not address medical benefits, specifically the surgery he received. TMIC claims Ruttiger could have presented, but did not, a dispute to the Commission at or before the January 2005 BRC and obtained a determination that surgery was necessary in

July 2004. Ruttiger asserts that the benefit dispute agreement did not need to address medical benefits because the medical necessity of the surgery was not in dispute and any administrative option became moot when TMIC paid for Ruttiger's medical treatment. Because the trial court had jurisdiction over Ruttiger's claims for TMIC's delay in paying income benefits and in light of our disposition

We next consider TMIC's contentions relating to the Insurance Code.

## III. Insurance Code Claims

### A. Section 541.060

■ Chapter 541 of the Insurance Code is entitled "Unfair Methods of Competition and Unfair or Deceptive Acts or Practices."[8] Ruttiger brought claims for violations of sections 541.060 and 541.061, for which section 541.151 provides a private cause of action. Section 541.060, as relevant to Ruttiger's claims, provides as follows:

**Unfair Settlement Practices**

(a) It is an unfair method of competition or an unfair or deceptive act or practice in the business of insurance to engage in the following unfair settlement practices with respect to a claim by an insured or beneficiary:

(1) misrepresenting to a claimant a material fact or policy provision relating to coverage at issue;

(2) failing to attempt in good faith to effectuate a prompt, fair, and equitable settlement of:

(A) a claim with respect to which the insurer's liability has become reasonably clear; . . .

(3) failing to promptly provide to a policyholder a reasonable explanation of the basis in the policy, in relation to the facts or applicable law, for the insurer's denial of a claim or offer of a compromise settlement of a claim;

. . . .

(7) refusing to pay a claim without conducting a reasonable investigation with respect to the claim. . . .

Tex. Ins.Code § 541.060.

TMIC asserts that because the Labor Code and WCD rules set specific deadlines and procedures for both paying and denying workers' compensation claims and impose administrative penalties for failing to comply with them, allowing recovery under the Insurance Code would be inconsistent with what the Legislature has deemed to be adequate protections for workers. TMIC concludes that as between section 541.060 and the Act, the Act is the exclusive remedy. Ruttiger responds that under *Aetna Casualty & Surety Co. v. Marshall*, 724 S.W.2d 770 (Tex.1987), an employee has a cause of action under the Insurance Code against a workers' compensation carrier.

In *Marshall* we considered whether an injured worker who had settled his compensation claim by agreed judgment could recover damages under former article 21.21[9] of the Insurance Code when the carrier failed to comply with the agreed judgment. *Marshall*, 724 S.W.2d at 770. At that time, article 21.21 provided a cause of action to a person who sustained actual damages as a result of an insurance carrier's deceptive acts or practices. *Id.* at 772. Marshall sued Aetna under article 21.21, claiming that Aetna represented to him that it would provide benefits under the agreed judgment and then refused to do so. *Id.* Aetna argued, in part, that Marshall was limited to relief provided by the

---

of TMIC's remaining issues, we need not determine whether the trial court lacked jurisdiction over Ruttiger's claim for delayed surgery.

8. Ruttiger asserts that TMIC waived its position that the Insurance Code does not provide a legal basis for him to recover damages.

The record reflects that TMIC objected to the jury charge on that basis and challenged the legal sufficiency of the evidence to support a judgment against it in the court of appeals. TMIC did not waive error.

9. Act of Apr. 25, 1957, 55th Leg., R.S., ch. 198, § 1, 1957 Tex. Gen. Laws 401.

Act: a suit to recover unpaid medical expenses and a 12% penalty. *Id.*

We disagreed with Aetna and held that Marshall could recover under the Insurance Code stating that "[t]he mere fact that Marshall was injured while working should not be used as a shield by Aetna to escape the punitive provisions of article 21.21." *Id.* So, we agree with Ruttiger that at the time it was decided, *Marshall* answered the question of whether an employee could assert a claim under the Insurance Code against a workers' compensation carrier. However, the workers' compensation landscape changed after *Marshall* was decided. As we explain below, a cause of action under section 541.060 is incompatible with the provisions of the current Act.

Various aspects of the Texas workers' compensation system have been criticized from the time the first Employers' Liability Act was enacted in 1913. *See Tex. Workers' Compensation Comm'n v. Garcia*, 893 S.W.2d 504, 512–13 (Tex.1995). In the early 1980s, unusually heavy criticism of the system, its costs to employers, benefits to injured workers, and dispute resolution procedures began surfacing. *Id.* (citing Joint Select Committee on Workers' Compensation Insurance, A Report to the 71st Texas Legislature 3 (1988) (hereafter "Joint Committee Report")). In response to the increasing criticism, in 1987 the Legislature appointed an interim committee to study the system.[10] Tex. H.R. Con. Res. 27, 70th Leg., 2d C.S., 1987 Tex. Gen. Laws 920. The committee held hearings around the state and in 1988 formulated its report to the Legislature, noting several major areas of concern about the existing system. Joint Committee Report at 2–4. In 1989, the Legislature undertook to reform the workers' compensation statutes in what has been called "the most divisive legislative endeavor in contemporary Texas politics" up until that time. 1 JOHN T. MONTFORD ET AL., A GUIDE TO TEXAS WORKERS' COMP REFORM 1 (1991) (hereafter MONTFORD). After failing in the regular and first special session to enact reforms, the Legislature finally did so in a second special session. The key, and most controversial, reforms were in the areas of employee benefits and dispute resolution. *See id.*, at ix. As to the dispute resolution process, the reform amendments "culminated in an essentially new set of Texas workers' compensation laws." *Id.* at 6–14.

Differences between the dispute resolution processes under the former law and the amended Act[11] are stark. When a claim was disputed under the former law, the injured employee and the workers' compensation carrier attended an informal pre-hearing conference. *Garcia*, 893 S.W.2d at 512. Testimony was not taken and generally the only discernable result of the conference was a written recommendation by the pre-hearing officer. *Id.* That recommendation was presented to the Industrial Accident Board (IAB) at a "formal" hearing in Austin. *Id.* The formal hearing in most instances was more formality than hearing: attendance by the parties or their representatives was dis-

---

10. The Senate representatives on the committee were Senators Bob Glasgow, Kent Caperton, Cyndi Krier, John Montford, and Frank Tejeda. The House representatives were Representatives Richard Smith, David Cain, Robert Early, Alex Moreno, and Rick Perry. Senator Glasgow and Representative Smith were co-chairs. A six member advisory panel assisted the committee.

11. For ease of reference the Act as amended will generally be referred to as the Act, or in some cases the amended Act; the law as it was before the 1989 amendments will be referred to as the old law or the former law.

couraged and for the overwhelming majority of claims no one attended and no testimony was taken or submitted. 1 MONTFORD, at 6–32 n. 18 (noting that of more than 17,000 claims scheduled for IAB hearing in 1989, only 70 were actually heard while the remainder were simply passed through as a matter of course so they could proceed to the judicial level). After the IAB made its award, either party could appeal for judicial review by trial de novo. *Garcia*, 893 S.W.2d at 512. Once a claim was appealed, the IAB lost jurisdiction over the claim and the IAB proceedings, directives, and award were of no further effect. 1 MONTFORD, at 6–33. Under the old law the IAB's involvement was many times secondary and frequently the IAB proceedings were no more than a "way station" on the way to the courthouse. *Id.*

The 1989 amendments and the current Act provide significantly more meaningful proceedings at the administrative agency level so as to reduce the number and cost of judicial trials, speed up the time for the entire dispute resolution process, and facilitate interlocutory payment of benefits pending final resolution of disputes. *Id.* at 6–28. To achieve these purposes the amended Act contains detailed procedures and penalties for failures of the various interested parties to comply with statutory and regulatory requirements.

We recently considered the relationship between a general statutory cause of action and one in which the statute had a more detailed, specific claims resolution process in *City of Waco v. Lopez*, 259 S.W.3d 147 (Tex.2008). In that case, Lopez filed a whistleblower suit based on allegations that he was discharged in retaliation for reporting age and race discrimination that violated the City's EEO policy. *Id.* at 149. The City argued that the Texas Commission on Human Rights Act

(CHRA), TEX. LAB.CODE §§ 21.001–.556, provided the exclusive remedy for Lopez's claim. *Lopez*, 259 S.W.3d at 150. Lopez did not file a claim under the CHRA and urged that he could elect to proceed under either the CHRA or the Whistleblower Act. *Id.* at 151–52. The Whistleblower Act generally prohibits governmental entities from suspending or terminating the employment of a public employee who in good faith reports a violation of law by the employing governmental entity to an appropriate law enforcement authority, and provides a general remedy for retaliation based on the report of any violation of law. *See* TEX. GOV'T CODE §§ 554.001–.010. The CHRA, on the other hand, prohibits retaliation against employees on the basis of employment discrimination. *Lopez*, 259 S.W.3d at 153–54.

We held that relief under the more general Whistleblower Act with its comparatively simple administrative exhaustion procedures was incompatible with and foreclosed by the more specific and comprehensive anti-retaliation remedy in the CHRA. *Id.* at 154; *see id.* at 153 (noting that in determining legislative intent, we are guided by the principle that a specific statute will prevail over a more general statute). In reaching our conclusion, we compared the policies behind each statute as well as the procedural requirements and remedies provided by each. *Id.* at 154. We noted that the CHRA embodied policies that included administrative procedures involving informal conference, conciliation and persuasion, as well as judicial review of administrative action. *Id.* (quoting *Schroeder v. Tex. Iron Works, Inc.*, 813 S.W.2d 483, 487 (Tex.1991)). We concluded that

[i]t is conceptually untenable that the Legislature would have erected two alternative state statutory remedies, one that enacts a structured scheme favoring

investigation and conciliation and carefully constructs rights, remedies, and procedures under that scheme (the CHRA) and one that would significantly undermine that scheme (the Whistleblower Act).

*Id.* at 155–56.

As we did in *Lopez*, we must consider the purposes, policies, procedural requirements, and remedies of the Insurance Code and the Workers' Compensation Act to determine whether the Legislature intended to effectively provide two different remedies to injured workers. The purpose of Chapter 541 of the Insurance Code is to

regulate trade practices in the business of insurance by:

(1) defining or providing for the determination of trade practices in this state that are unfair methods of competition or unfair or deceptive acts or practices; and

(2) prohibiting those trade practices.

TEX. INS.CODE § 541.001. The Chapter provides a private action for damages against someone who has engaged in a specified act or practice. *Id.* § 541.151. A plaintiff who prevails on such an action is entitled to actual damages and treble damages if the trier of fact finds that the defendant "knowingly" committed the act. *Id.* § 541.152.

█ The purpose of the Act is

to provide employees with certainty that their medical bills and lost wages will be covered if they are injured. An employee benefits from workers' compensation insurance because it saves the time and litigation expense inherent in proving fault in a common law tort claim. But a subscribing employer also receives a benefit because it is then entitled to assert the statutory exclusive remedy defense against the tort claims of its employees for job related injuries.

*HCBeck, Ltd. v. Rice*, 284 S.W.3d 349, 349 (Tex.2009); *see In re Poly–Am., L.P.*, 262 S.W.3d 337, 349 (Tex.2008) ("In order to ensure compensation for injured employees while protecting employers from the costs of litigation, the Legislature provided a mechanism by which workers could recover from subscribing employers without regard to the workers' own negligence, while limiting the employers' exposure to uncertain, possibly high damage awards permitted under the common law." (citations omitted)); *see also* TEX. LAB.CODE § 408.001(a) ("Recovery of workers' compensation benefits is the exclusive remedy of an employee covered by workers' compensation insurance coverage. . . ."). To accomplish these purposes, the Act provides detailed notice and administrative dispute resolution proceedings that include specific deadlines and incorporate a "conveyor-belt" approach. That is, once the administrative dispute resolution process is initiated, a dispute continues through the process until the dispute is resolved either by the parties or by a binding decision through the resolution procedures.

The claims process begins when an employee reports a lost-time injury or occupational disease to the employer. The employer, as required by the Act, then reports the injury claim to the carrier. *Id.* § 409.005(a). Within fifteen days of receiving written notice of an employee's injury claim, the carrier must initiate benefit payments or notify the WCD and the employee of its refusal to pay. *Id.* § 409.021(a). If the carrier refuses to pay or terminates benefits, it is required to advise the employee of his or her right to request a BRC and of the means to obtain further information from the WCD. *Id.* § 409.021(a)(2). The carrier also must specify its grounds for refusal. *Id.* § 409.022. Once the WCD receives notice of an employee's claim, it must mail the

employee a description of (1) the services the WCD provides; (2) the WCD's procedures; (3) the services provided by the office of injured employee counsel, including the ombudsman program which provides free assistance to injured employees in the dispute resolution process; and (4) the employee's rights and responsibilities under the Act. *Id.* § 409.010. Then, if there are disputed issues, the dispute resolution process begins when a party requests a BRC or the WCD sets a BRC on its own motion. *Id.* § 410.023(a). If a BRC is requested, the WCD must schedule it within forty days after receiving the request, or within twenty days if compensability or liability for essential medical treatment is in dispute. *Id.* § 410.025(a); 28 TEX. ADMIN. CODE § 141.1(h).

If all disputed issues are not resolved at the BRC, the dispute resolution process is designed to automatically move to the next step: the Act requires the WCD to schedule a CCH before a hearing officer within sixty days. TEX. LAB.CODE § 410.025(b). Sworn testimony and other evidence is received at the CCH and a record of the proceeding is made. *Id.* §§ 410.163–.166. The decision of the CCH officer regarding benefits is final unless it is timely appealed. *Id.* § 410.169. A party dissatisfied with the CCH decision may appeal it to an appeals panel, but the hearing officer's decision is binding during pendency of the appeal. *Id.*

If a CCH decision is appealed, the appeals panel's written decision is based on the CCH record, the written request for an appeal, and the response. *Id.* § 410.203. If the appeals panel does not issue a decision within forty-five days after the response to the appeal request is filed, then the decision of the CCH officer is final absent timely appeal for judicial review. *Id.* §§ 410.204, 410.205(a). And just as the decision of the CCH officer is bind-

ing during appeal to the appeals panel, the decision of the appeals panel is binding during pendency of an appeal for judicial review. *Id.* § 410.205(b). Judicial review regarding compensability or income benefits is limited to issues decided by the appeals panel and on which judicial review is specifically sought. *Id.* § 410.302(b). If trial is by jury, the court must instruct the jury as to the decision of the appeals panel on each of the disputed issues submitted. *Id.* § 410.304(a). If trial is without a jury, the court is required to consider the decision of the appeals panel. *Id.* § 410.304(b).

A carrier's failure to comply with the Act's requirements, deadlines, and procedures is not without consequences. First, the Act specifies administrative violations both in particular sections and in a general, catchall provision. For example, if a carrier fails to initiate compensation or notify the WCD of its refusal to do so within fifteen days of receiving notice of injury, it is an administrative violation subject to monetary penalties up to $25,000 per day. *Id.* §§ 409.021(e), 415.021. The Act also provides that a carrier or its representative commits an administrative violation for any of twenty-two specified actions, including failing to process claims promptly and in a reasonable and prudent manner, controverting a claim if the evidence clearly indicates liability, and failing to comply with the Act. *Id.* § 415.002(11), (18), (22). If a carrier refuses or fails to comply with an order of the WCD, either interlocutory or final, or a decision of the commissioner, within twenty days of when the decision or order becomes final, it commits an administrative violation. *Id.* § 410.208(e). Also, both the WCD and claimant are specifically authorized by the Act to file suit to enforce the order and recover attorneys' fees. *Id.* § 410.208(a)-(c). A claimant who brings suit is entitled to recover 12% of the amount of benefits

recovered in the judgment as a penalty. *Id.* § 410.208(d).

Further, the WCD is required to monitor the actions of carriers, as well as other parties in the workers' compensation system, for compliance with "commissioner rules, [the Act], and other laws relating to workers' compensation." *Id.* § 414.002(a). In addition to its mandate to monitor carriers and other participants in the system, the WCD has a separate mandate to, at the carriers' expense, "review regularly the workers' compensation records of insurance carriers as required to ensure compliance with [the Act]." *Id.* § 414.004(a), (c). The Act also provides that in addition to other sanctions or remedies, the WCD commissioner has authority to assess administrative penalties of up to $25,000 per day per occurrence for violations of the Act. *Id.* § 415.021(a).

It is apparent that the Act prescribes detailed, WCD-supervised, time-compressed processes for carriers to handle claims and for dispute resolution. It has multiple, sometimes redundant but sometimes additive, penalty and sanction provisions for enforcing compliance with its requirements. Permitting a workers' compensation claimant to additionally recover by simply suing under general provisions of Insurance Code section 541.060 would be inconsistent with the structure and detailed processes of the Act. Not only would such a recovery be inconsistent with the Act's goals and legislative intent exhibited in the Act, it could also result in rewarding an employee who is dilatory in utilizing the Act's detailed dispute resolution procedures, regardless of whether the delay was intentional or inadvertent, because whether and when the dispute resolution begins is by and large dependent on the employee.

For example, Ruttiger's damages claim was based on TMIC's delay in providing both income and medical benefits and the delay's effect on him over and above what the effects of his injury would have been had TMIC not terminated benefits in July 2004. But Ruttiger and his lawyer did not seek immediate resolution of his dispute with TMIC by promptly requesting a BRC. Rather, they waited over three months from the time they knew TMIC was contesting the claim to do so. Ruttiger and TMIC resolved their dispute by agreement at the first BRC they attended—just as is contemplated by the Act's procedures.[12] As we stated in *Lopez*, "[i]t is conceptually untenable that the Legislature would have erected two alternative statutory remedies, one that enacts a structured scheme ... and carefully constructs rights, remedies, and procedures ... and one that would significantly undermine that scheme." *Lopez*, 259 S.W.3d at 155–56. If allowed to bring Insurance Code claims, workers' compensation claimants will actually have incentive to delay seeking resolution of disputes through the carefully crafted administrative dispute resolution procedures of the Act. As is demonstrated by the facts of this case, an employee's delay in initiating the Act's expedited dispute resolution procedures can generate both recovery of benefits under the Act and a separate, additional lawsuit for damages and delay in derogation of the Act's carefully crafted dispute resolution procedures. Instead of encouraging claim-

12. The record does not reflect, and Ruttiger does not argue, that the WCD determined TMIC committed administrative violations by failing to process claims in a reasonable and prudent manner, *see* TEX. LAB.CODE § 415.002(a)(11); by refusing to pay benefits without having reasonable grounds, *see id.* § 409.022(c); or by terminating benefits absent substantiating evidence that doing so was reasonable and authorized by law. *See id.* § 415.002(a)(2).

ants to immediately seek resolution of their disputes by means of the legislatively mandated aids such as the ombudsman program and WCD-directed administrative procedures, allowing an Insurance Code cause of action would provide an incentive for employees to wait weeks or months to initiate the Act's expedited dispute resolution procedures and then file suit for damages under the Insurance Code, as was done here.

Further, Insurance Code section 541.060 is entitled "Unfair Settlement Practices." Its text provides that specified acts or practices are "unfair settlement practices" and that those settlement practices are unfair methods of competition and unfair or deceptive acts or practices in the business of insurance. TEX. INS.CODE § 541.060(a). In the Act, settlements are defined as "a final resolution of all the issues in a workers' compensation claim that are permitted to be resolved under terms of [the Act]." TEX. LAB.CODE § 401.011(40). A settlement (1) may not resolve an issue of impairment before the employee reaches maximum medical improvement (and settlement agreements even after that point must adopt an impairment rating using guidelines prescribed by the Act); (2) may not provide for payment of benefits in a lump sum except when an employee (a) has returned to work for at least three months earning at least 80% of the employee's average weekly wage and (b) elects to commute impairment income benefits; and (3) may not limit or terminate the employee's right to medical benefits. *Id.* § 408.005(a)-(c). At the time Ruttiger filed suit in this matter he had not reached maximum medi-

cal improvement, did not have an impairment rating from his doctors, and had not returned to work. Thus, as of the time he filed suit complaining of TMIC's past delays, his workers' compensation claim could not yet have been settled.

In sum, this Court held in 1987 that an injured worker was not limited to recovery under the Act, but could also recover under the Insurance Code. *Marshall,* 724 S.W.2d at 772. But the current Act with its definitions, detailed procedures, and dispute resolution process demonstrating legislative intent for there to be no alternative remedies was not in effect in 1987. The Legislature's definition of "settlement" under the current Act reflects legislative intent that is at odds with the intent reflected in Insurance Code section 541.060; the limited definition of "settlement" provided in the Act does not fit within the construct of section 541.060.[13] The provisions of the amended Act indicate legislative intent that its provisions for dispute resolution and remedies for failing to comply with those provisions in the workers' compensation context are exclusive of those in section 541.060. Thus, we agree with TMIC that Ruttiger may not assert a cause of action under section 541.060.

### B. Section 542.003

■ The jury charge also asked whether TMIC, with respect to a claim by an insured or beneficiary, failed "to adopt and implement reasonable standards for prompt investigation of claims arising under its policies." Such action by an insurer is prohibited by Insurance Code section 542.003(a), (b)(3).[14] But as we discussed in

---

13. Ruttiger does not claim that the agreement he reached with TMIC at the BRC was a settlement. *See* TEX. LAB.CODE § 401.011(3) (defining "agreement" as the resolution by the parties of one or more issues regarding an

injury, coverage, or compensability, but not a settlement).

14. TMIC argues that the Insurance Code does not provide for a private cause of action for a

the preceding section, the Act contains specific requirements with which a workers' compensation carrier must comply when contesting a claim, and provides that failure to comply with the requirements can constitute waiver of the carrier's rights as well as subject the carrier to significant administrative penalties. The Act's requirements include time limits for payment of benefits, giving notice of a compensability contest and the specific reason for the contest, and necessarily subsume the requirement of proper investigation and claims processing. *See, e.g.,* TEX. LAB.CODE § 409.021(a) (providing that a carrier must initiate benefit payments or notify the WCD and the employee of its refusal to pay within fifteen days of receiving written notice of an employee's injury and if the carrier refuses to pay or terminates benefits, it is required to advise the employee of his or her right to request a BRC and of the means to obtain further information from the WCD); *id.* § 409.021(c) (providing that a carrier waives its right to contest compensability if it does not contest compensability within sixty days of receiving notice of injury); *id.* § 409.022 (providing that when refusing to initiate benefits or when terminating benefits, the carrier must specify its grounds and a carrier commits an administrative violation if the carrier does not have reasonable grounds for refusing to pay benefits); *id.* § 415.002(a) (providing that a carrier commits an administrative violation for, among other actions, failing to process claims promptly and in a reasonable manner, failing to initiate benefits when due if a legitimate dispute does not exist as to the liability of the carrier, terminating or reducing benefits without substantiating evidence that the action is reasonable and author-

ized by law, or controverting a claim if the evidence clearly indicates liability).

We conclude, as we did with section 541.060, that in light of the specific substantive and procedural requirements built into the Act and the detrimental effects on carriers flowing from penalties that can be imposed for failing to comply with those requirements, the Legislature did not intend for workers' compensation claimants to have a cause of action against the carrier under the general provision of section 542.003. To the extent *Marshall* is in conflict with any of the foregoing, we overrule it.

### C. Section 541.061

█ The trial court judgment also allowed Ruttiger to recover under section 541.061 of the Insurance Code, which provides:

**Misrepresentation of Insurance Policy**

It is an unfair method of competition or an unfair or deceptive act or practice in the business of insurance to misrepresent an insurance policy by:

(1) making an untrue statement of material fact;

(2) failing to state a material fact necessary to make other statements made not misleading, considering the circumstances under which the statements were made;

(3) making a statement in a manner that would mislead a reasonably prudent person to a false conclusion of a material fact....

TEX. INS.CODE § 541.061. TMIC asserts that section 541.061 is not a legal basis for Ruttiger to recover damages for the same reasons he may not recover damages un-

violation of this section. This is the first time TMIC has made this argument. It has not

been preserved and we do not address it.

der Insurance Code section 541.060. We disagree.

Unlike section 541.060, section 541.061 does not specify that it applies in the context of settling claims. *See id.* § 541.060(a) (defining unfair settlement practices "with respect to a claim"). Section 541.061 applies to the misrepresentation of an insurance policy, but because it does not evidence intent that it be applied in regard to settling claims, it is not at odds with the dispute resolution process of the workers' compensation system.

■ Nevertheless, we agree with TMIC that there is legally insufficient evidence to support a finding that it misrepresented its policy. TMIC denied Ruttiger's claim on the basis that he was not injured on the job. Ruttiger does not point to any untrue statement made by TMIC regarding the policy or any statement about the policy that misled him. The dispute between Ruttiger and TMIC was over whether Ruttiger's claim was factually within the policy's terms—whether he was injured on the job. And the parties' BRC agreement did not resolve any issues regarding TMIC's policy terms. It resolved whether Ruttiger was injured in the course of his employment with A & H. While we disagree with TMIC's assertion that Ruttiger's claim under section 541.061 is precluded by the Act, we agree with its legal sufficiency challenge to the evidence supporting a finding based on section 541.061.

Because the provisions of section 541.060 and 542.003 cannot support a judgment against TMIC for unfair settlement practices and there is no evidence to support a finding pursuant to section 541.061 that TMIC misrepresented its insurance policy, we reverse the court of appeals' judgment affirming Ruttiger's recovery on his claim under the Insurance Code.

## IV. Deceptive Trade Practices Act

Ruttiger agrees that his DTPA claim as pled and submitted to the jury depended on the validity of his Insurance Code claim. Because we have determined that he cannot recover on his Insurance Code claim, we likewise hold that he cannot recover on his DTPA claim.

## V. Good Faith and Fair Dealing

■ The trial court's judgment provides that if Ruttiger's Insurance Code and DTPA claims failed on appeal, he could elect to recover on his claim that TMIC breached its common law duty of good faith and fair dealing. The court of appeals did not address the issue, but it has been briefed and argued here, so we will. *See* Tex.R.App. P. 53.4; *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. CBI Indus., Inc.,* 907 S.W.2d 517, 520–22 (Tex.1995).

TMIC asserts, in part, that Ruttiger cannot recover for breach of the duty of good faith and fair dealing because the cause of action is no longer warranted given the provisions of the current Act.

In *Arnold v. National County Mutual Fire Insurance Co.,* the Court held that a duty of good faith and fair dealing arises from the relationship between an insurer and a first-party insured. 725 S.W.2d 165, 167 (Tex.1987). The Court noted that "without such a cause of action insurers can arbitrarily deny coverage and delay payment of a claim with no more penalty than interest on the amount owed. An insurance company has exclusive control over the evaluation, processing and denial of claims." *Id.* at 167. In *Aranda v. Insurance Co. of North America,* we imposed the holding of *Arnold* onto the workers' compensation system and held that an injured employee was entitled to assert a claim against a workers' compensation carrier for breach of the duty of good faith and fair dealing. 748 S.W.2d

210, 212–13 (Tex.1988) (sometimes hereafter referred to as an *Aranda* cause of action for ease of reference). We pointed out three reasons for holding that an employee should be allowed to assert such a claim outside the workers' compensation dispute resolution system: (1) the disparity of bargaining power between compensation insurers and employees, (2) the exclusive control that an insurer exercises over processing of claims, and (3) arbitrary decisions by carriers to refuse to pay or delay payment of valid claims leave the injured employees with no immediate recourse. *Id.*

*Aranda* was decided in 1988. Even before it was decided, however, the Legislature had begun an intensive study of how to best modify the workers' compensation system that interested parties and experts agreed needed changing. The study identified numerous deficiencies, including those set out in *Aranda. See generally* Joint Committee Report. During the regular and a special legislative session following *Aranda,* the Legislature struggled without success to enact major reforms to the Act. It was only in a second special session that overhaul of the system was finally accomplished. As can be seen from our discussion of the 1989 amendments in section III.A. above, and as we explain in more detail below, those reforms and subsequent amendments to the Act addressed the three deficiencies underlying *Aranda*—and much more.[15]

In *Aranda* we expressed concern that a carrier could arbitrarily refuse to pay benefits, leaving an injured worker without immediate recourse because "the mechanisms provided by the Workers' Compensation Act do not afford immediate relief to the injured employee who is denied compensation." 748 S.W.2d at 212. The Joint Committee Report emphasized that one major deficiency of the process for delivering benefits was "[t]he system has no means to render fast decisions in disputes which require them." Joint Committee Report, at 4. A brief review of the former dispute resolution system demonstrates the problems.

As outlined above, under the old law the first step in the administrative dispute resolution process was an informal pre-hearing conference where a record was not made and the result generally was a written recommendation of the pre-hearing officer that was sent to the IAB in Austin. *Garcia,* 893 S.W.2d at 512. The IAB hearing in Austin was not designed to be an actual hearing, but was primarily for the purpose of making an award based on the pre-hearing officer's recommendation. *Id.* After the IAB's award completed the administrative process, either the employee

---

**15.** The factual situation underlying *Aranda* is specifically addressed by the Act. In *Aranda* an employee was injured while working for two employers. 748 S.W.2d at 211. The employers had different workers' compensation carriers. *Id.* The carriers did not contest whether the employee's injury was compensable, but each asserted that the other was liable for the employee's benefits and neither provided benefits pending resolution of the dispute by the IAB. *Id.*

Section 410.033 of the current Act is entitled "Multiple Carriers" and provides:
(a) If there is a dispute as to which of two or more insurance carriers is liable for compensation for one or more compensable injuries, the commissioner may issue an interlocutory order directing each insurance carrier to pay a proportionate share of benefits due pending a final decision on liability. The proportionate share is computed by dividing the compensation due by the number of insurance carriers involved.
(b) On final determination of liability, an insurance carrier determined to be not liable for the payment of benefits is entitled to reimbursement for the share paid by the insurance carrier from any insurance carrier determined to be liable.
TEX. LAB.CODE § 410.033.

or carrier could appeal the award to the district court for a trial de novo. *See Latham v. Sec. Ins. Co.*, 491 S.W.2d 100, 103–04 (Tex.1972) (interpreting former Tex.Rev.Civ. Stat. art. 8307, § 5). If a party appealed for judicial review, the appeal vacated the award, the IAB lost jurisdiction over the proceedings, and the carrier could stop providing benefits; or, if the carrier had been contesting compensability of the claim and had not been paying benefits, it could continue to refuse to provide benefits even if the IAB award was in favor of the employee. *Id.*; 1 Montford, at 6–33. Plus, there was no effective procedure for resolving disputes over medical care. 1 Montford, at 4–27.

The lack of an immediate, binding dispute resolution process under the old law resulted in carriers, for the most part, having control over claims resolution. That control yielded greatly disparate bargaining positions between insurers and injured workers, and the IAB was considered to have had relatively little power to control the process. *See Garcia*, 893 S.W.2d at 512–13; Joint Committee Report, at 5 (stating that under the old law "[t]he agency lacks either the ability or the resources to effectively control the behavior of participants and to compel appropriate actions when they are required"). As outlined above, the IAB's dispute resolution process was considered a formalistic ritual through which claims had to pass to get to the courthouse. Hearings were rarely meaningful and the procedures did not provide incentive to insurers to make indemnity payments to injured workers nor did they provide a disincentive to insurers to dispute payment for medical benefits. 1 Montford, at 6–32. And because of the delay inherent in and cost of reaching the system's first factfinding process—a de novo trial when the IAB award was appealed—disputes were primarily resolved through compromise before an injured worker's medical condition had stabilized. That situation increased the probability that "assessment of disability (and hence, the benefits) [would] be inaccurate." Joint Committee Report, at 5; *see Garcia*, 893 S.W.2d at 512–13 ("The delay and cost of *de novo* review forced premature and inaccurate settlements.").

The 1989 reforms were intended to reduce the costs to employers and provide greater benefits to injured employees in a more timely fashion. Achieving those goals required, among other changes, reducing the disparity of bargaining power between the employee and insurer, imposing controls over the carriers' processing of claims, and controlling the ability of carriers to make arbitrary decisions about refusing or delaying payment. Those changes were accomplished by providing meaningful, binding administrative dispute resolution procedures, speeding up "the start-to-finish time for the entire comp dispute resolution process, as well as [facilitating] interlocutory payment of comp benefits pending final resolution." 1 Montford, at 6–28.

Some of the amendments relevant to the issue before us have been previously discussed, but nevertheless, we review them here because of their importance in giving context and perspective to this discussion. When compared to the old law, the Act provides a reduced amount of time for carriers to file a notice of dispute or start paying benefits. Tex. Lab.Code § 409.021 (providing that a carrier shall begin paying benefits or file a notice of dispute within fifteen days after receiving written notice of injury). Failure to meet the time limit is an administrative violation which is subject to a penalty of up to $25,000 per day. *Id.* §§ 409.021(e), 415.021. The carrier has statutory and regulatory duties to promptly conduct adequate investigations and

reasonably evaluate and expeditiously pay workers' legitimate claims or face administrative penalties. *See, e.g., id.* § 409.021. If a carrier on multiple occasions fails to pay benefits promptly as they accrue, except as authorized by the Act, the carrier is subject to an additional administrative violation and even revocation of its right to do business under the workers' compensation statutes. *Id.* § 409.023(d).

Under the Act's dispute resolution process, the BRC begins a process in which disputes proceed from one part of the process to the next until the dispute is resolved by agreement, final order or decision of the WCD, or judicial order. A BRC must be held within forty days of a request for one, or within twenty days if an expedited setting is needed. 28 Tex. Admin. Code § 141.1(h). Unless the dispute is resolved at the BRC, the WCD must schedule a CCH to take place within sixty days of the BRC, Tex. Lab.Code § 410.025(b), or within thirty days if an expedited setting is appropriate. 28 Tex. Admin.Code § 142.6(a)(2). At the CCH a record is made and the dispute is heard by a WCD hearing examiner whose decision is final unless an appeal is filed within fifteen days. Tex. Lab.Code §§ 410.164, 410.169. If the decision is appealed, the decision of the CCH officer is binding during the appeal and an appeals panel must issue a written decision within forty-five days. *Id.* §§ 410.169, 410.204. Appeals for judicial review are circumscribed by the Act to minimize the expense and time for discovery and trial preparation. *See, e.g., id.* § 410.255 (judicial review of issues other than compensability or income or death benefits is by the substantial evidence rule); *id.* § 410.306 (unless an employee's condition has substantially changed, evidence at trial is limited to that presented to the WCD). And during the process the carrier is not in exclusive control. The WCD has the authority to issue interlocutory benefit-payment orders that are binding as to past as well as future benefits. *Id.* §§ 410.032, 410.168(c), 413.055.

The Act addresses the disparity of bargaining power between the employee and the insurer, in part, by providing an Office of Injured Employee Counsel. Tex. Lab. Code § 404.101. That office provides assistance to injured employees through an ombudsman program by which employees have trained assistance during the dispute resolution process even if the employee is not represented by counsel. *Id.* The disparity is also addressed by limitations on settling of claims. Lump-sum benefit settlement payments are not permitted except in certain specific, limited circumstances and settlements resolving issues of impairment may not be made before an employee reaches maximum medical improvement. *Id.* § 408.005(c)(1). When settlements regarding impairment issues are permitted, they must be according to the opinion of a treating or designated doctor assessing impairment based on objective, standardized guidelines. *Id.* § 408.005(c)(2). Those provisions limit a carrier's ability to overreach during any dispute resolution proceedings or settlement negotiations with workers.

In sum, the Legislature has substantially remedied the deficiencies that led to this Court's extending a cause of action under *Arnold* for breach of the duty of good faith and fair dealing to the workers' compensation system. The current system (1) reduces the disparity of bargaining power between compensation insurers and employees; (2) removes insurers' exclusive control over the processing of claims; (3) diminishes and in most instances negates the ability of insurers to make arbitrary decisions refusing or unreasonably delaying payment of valid claims; (4) provides employees information about, immediate

recourse to, and, through the ombudsman program, free assistance before the WCD with the claims and dispute resolution process; and (5) provides multiple remedies and penalties, including specific provisions for revocation of the carrier's right to do business under the workers' compensation laws of Texas if on multiple occasions it fails to pay benefits promptly and as they accrue.

The original creation of, continued existence of, and amendments to update and improve the workers' compensation system are within the Legislative function of establishing public policy. *See Town of Flower Mound v. Stafford Estates Ltd. P'ship*, 135 S.W.3d 620, 628 (Tex.2004) ("Generally, 'the State's public policy is reflected in its statutes.'") (quoting *Tex. Commerce Bank, N.A. v. Grizzle*, 96 S.W.3d 240, 250 (Tex.2002)); *Lawrence v. CDB Servs., Inc.*, 44 S.W.3d 544, 553 (Tex. 2001) ("[T]he administration of the workers' compensation system is heavily imbued with public policy concerns."); *James v. Vernon Calhoun Packing Co.*, 498 S.W.2d 160, 162 (Tex.1973) (noting that the "policy of the state [is] declared in the Workmen's Compensation Law"). The cornerstone provision of the 1913 Employers' Liability Act by which an employee received workers' compensation benefits in exchange for the common law right to sue his employer for negligence in the event of an on-the-job injury was the product of a legislative public policy decision brought about by the nature and needs of a changing and more industrialized society. That concept, as well as the workers' compensation system which is continually amended, updated, and changed by the Legislature to reflect the State's changing societal needs, reflect policy decisions. Key parts of the system are the amount and types of benefits, the delivery systems for benefits, the dispute resolution processes for inevitable disputes that arise among partici-

pants, the penalties imposed for failing to comply with legislatively mandated rules, and the procedures for imposing such penalties. Those were some of the areas of concern both identified by the Legislature in the Joint Committee Report and underlying *Aranda*.

The essential question before us is not, as the dissent maintains, "whether the Legislature intended to abrogate entirely a common law bad faith remedy when it enacted the Workers' Compensation Act." 381 S.W.3d at 461 (Jefferson, C.J., dissenting). We do not believe it did. Rather, the question is to what extent the judiciary will respect the Legislature's function of addressing the concerns and adjusting the rights of parties in the workers' compensation system as part of its policy-making function. In reaching this conclusion it is important to keep in mind the fact that the workers' compensation system is wholly a legislatively crafted entity. Its continued existence and nature depends on the Legislature renewing, reviewing, and amending it to meet the changing needs of Texas employees and employers.

The *Aranda* cause of action operates outside the administrative processes and other remedies in the Act and is in tension with—and in many instances works in direct opposition to—the Act's goals and processes. In part, that tension arises because the extra-statutory cause of action provides incentive for an injured worker to delay using the avenues for immediate relief that the Legislature painstakingly built into the law—as happened in Ruttiger's case. Even if a carrier complies with the Act's provisions by timely notifying the employee of its refusal to pay benefits and the specific reasons why, then participating in a BRC, CCH, and even an appeal to a WCD appeals panel or for judicial review, the carrier still risks common law

liability. That situation distorts the balances struck in the Act and frustrates the Legislature's intent to have disputes resolved quickly and objectively. *See Lopez,* 259 S.W.3d at 154–56. Further, an extra-statutory cause of action builds additional costs into the system by increasing litigation expense to employees, insurers, and employers. *See Garcia,* 893 S.W.2d at 511–16 (discussing how through the 1989 amendments the Legislature sought to reduce delay and costs). It also discourages insurers from contesting suspect or questionable claims and medical treatments because of the possibility of unpredictable large damage awards if the carrier loses its contest, or even resolves a dispute as TMIC did with Ruttiger.

This case demonstrates how a cause of action for breach of the duty of good faith and fair dealing can hinder the prompt resolution of disputes through proper use of the Act's dispute resolution provisions and increase costs to participants in the system. TMIC timely notified Ruttiger that it was disputing his claim, why it was doing so, and notified him of his right to a BRC. When Ruttiger finally requested a BRC to resolve the dispute, one was scheduled and held, the dispute was resolved, and TMIC began paying benefits. The way the dispute was resolved after Ruttiger initiated the dispute resolution process is the way the Act is designed to function. The disruptive factor was Ruttiger's waiting three months to request a BRC. Such a delay is not what is contemplated by the statutes, and the time for which Ruttiger delayed in initiating the Act's dispute resolution procedures is the basis for his claim for damages in this suit.

The issues underlying the Court's decision in *Aranda* were serious. The Legislature recognized that those issues, as well as other serious shortcomings in the old law, needed to be addressed and it has

addressed them. It was the Court's prerogative to recognize the need to extend *Arnold*'s extra-contractual common law cause of action when it decided *Aranda;* it is the Court's prerogative and responsibility to recognize if the cause of action is no longer appropriate. *See In re McAllen Med. Ctr., Inc.,* 275 S.W.3d 458, 461 (Tex. 2008) ("[O]ur place in a government of separated powers requires us to consider also the priorities of the other branches of Texas government.").

The Act effectively eliminates the need for a judicially imposed cause of action outside the administrative processes and other remedies in the Act. Recognizing and respecting the Legislature's prime position in enacting, studying, analyzing, and reforming the system, and its efforts in having done that, we conclude that *Aranda* should be, and is, overruled.

## VI.  Response to the Dissent

### A.  The Common Law *Aranda* Claim

■ The dissent approaches the *Aranda* issue in two primary ways. In one approach it questions whether by the Act the Legislature intended to abrogate *Aranda*'s holding:

> The question presented in this case is whether the Legislature intended to abrogate entirely a common law bad faith remedy when it enacted the Workers' Compensation Act....
>
> . . . .
>
> We must decide, then, whether there is "clear legislative intent," *Dealers Elec. Supply Co. v. Scoggins Constr. Co.,* 292 S.W.3d 650, 660 (Tex.2009), to extinguish entirely this settled common law remedy.

381 S.W.3d at 461–62 (Jefferson, C.J., dissenting). The dissent concludes that the Act does not reflect Legislative intent to do so, and we agree. There is no language

that TMIC argues shows an intent to abolish the duty of good faith and fair dealing, the dissent sees none, and neither do we. Further, there is simply no question about what the Legislature intended. Its intent is taken from what it enacted—limits on the cause of action. *See Entergy Gulf States, Inc. v. Summers*, 282 S.W.3d 433, 437 (Tex.2009). Because the Act contains no language intended to extinguish the action, that should end the inquiry because this Court presumes the Legislature deliberately and purposefully selects words and phrases it enacts, as well as deliberately and purposefully omits words and phrases it does not enact. *See Tex. Lottery Comm'n v. First State Bank of DeQueen*, 325 S.W.3d 628, 635 (Tex.2010). But although we agree the Legislature did not intend to abolish the *Aranda* action, we disagree that whether it did is the question that must be answered. As we have noted previously, the essential question is not whether the Legislature intended to abrogate the common law bad faith remedy. The question is to what extent the judiciary will respect the Legislature's function of addressing the concerns and adjusting the rights of parties in the workers' compensation system.

The dissent's other approach is that sections 416.001 and 416.002 of the Act specifically recognize the common law cause of action for breach of the duty of good faith and fair dealing without abolishing it, thereby implicitly ratifying it or giving its existence the Legislature's stamp of approval. *See* 381 S.W.3d at 459 (Jefferson, C.J., dissenting) ("Even after the 1989 overhaul, the Act's express language makes plain the Legislature's intent that common law bad faith claims remain available to litigants."). In reaching its conclusion, the dissent inappropriately goes beyond the language of the Act.

When reading statutes, our goal is to ascertain and give effect to the Legislature's intent. *See F.F.P. Operating Partners, L.P. v. Duenez*, 237 S.W.3d 680, 683 (Tex.2007). That intent is drawn from the plain meaning of the words chosen by the Legislature when it is possible to do so, *see Entergy Gulf States, Inc.*, 282 S.W.3d at 437, using any statutory definitions provided. *See* Tex. Gov't Code § 311.011(b); *Tex. Dep't of Transp. v. Needham*, 82 S.W.3d 314, 318 (Tex.2002). Where statutory text is clear, that text is determinative of legislative intent unless the plain meaning of the statute's words would produce an absurd result. *Entergy Gulf States, Inc.*, 282 S.W.3d at 437. Only when statutory text is susceptible of more than one reasonable interpretation is it appropriate to look beyond its language for assistance in determining legislative intent. *See In re Smith*, 333 S.W.3d 582, 586 (Tex.2011).

The Act addresses the *Aranda* cause of action in two sections of Chapter 416:

### Certain Causes of Action Precluded

An action taken by an insurance carrier under an order of the commissioner or recommendations of a benefit review officer under Section 410.031, 410.032, or 410.033 may not be the basis of a cause of action against the insurance carrier for a breach of the duty of good faith and fair dealing.

Tex. Lab.Code § 416.001.

### Exemplary Damages

(a) In an action against an insurance carrier for a breach of the duty of good faith and fair dealing, recovery of exemplary damages is limited to the greater of:

(1) four times the amount of actual damages; or

(2) $250,000.

(b) An action against a governmental entity or unit or an employee of a governmental entity or unit for a breach of the duty of good faith and fair dealing is governed by Chapters 101 and 104, Civil Practice and Remedies Code.

*Id.* § 416.002. The dissent maintains, and we agree, that the language of both sections plainly and clearly demonstrates the Legislature's intent to limit the *Aranda* cause of action. But there is a great deal of difference between the Legislature's acknowledging the existence of and limiting the effects of the *Aranda* action and its implicitly ratifying or approving the action.

The language of section 416.001 is simple and forthright. And its full intent is clear: carriers cannot be assessed damages in an *Aranda* action for conduct pursuant to orders or directives of the WCD. There is no language in the section to indicate the Legislature intended to ratify or approve the *Aranda* action. The statute is completely silent on the issue. Likewise, nowhere in section 416.002's language limiting exemplary damages can intent to ratify or approve the *Aranda* cause of action be found. Again, the statute is completely silent on the issue. We presume the silence is a careful, purposeful, and deliberate choice. *See Tex. Lottery Comm'n,* 325 S.W.3d at 635.

■ Even though the dissent does not maintain that the language of either section 416.001 or section 416.002 is ambiguous, it goes beyond the Act's language to support its argument for legislative intent. It notes that the 1989 reform bill as originally introduced contained language making administrative penalties the exclusive consequence for bad faith or maliciously adjusting claims, but a committee substitute bill deleted that language and included language that only limited damages as to such actions. Generally, however, changes to language in bills as they pass through the legislative process are not relevant to legislative intent regarding legislation eventually enacted. *See Entergy Gulf States, Inc.,* 282 S.W.3d at 443 ("[W]e attach no controlling significance to the Legislature's failure to enact legislation ... for the simple reason that it is always perilous to derive the meaning of an adopted provision from another provision deleted in the drafting process." (citations omitted)). Language enacted as law frequently differs from a bill as originally introduced as well as from versions that pass through committee and floor debate in one chamber of the Legislature and then undergo the same process in the other chamber. And in many instances a bill is finally sent to a conference committee to work out even different compromise language. The reasons for changes in a bill's language are not always expressed in hearings or documented in records. But even if they were, the intent of the Legislature as a whole is not derived from language that was in a bill at some point or from the perceived intent of a committee that produced a committee substitute bill. The intent of the Legislature is derived from the language it finally enacted. *Alex Sheshunoff Mgmt. Servs., L.P. v. Johnson,* 209 S.W.3d 644, 651 (Tex.2006) ("Ordinarily, the truest manifestation of what legislators intended is what lawmakers enacted, the literal text they voted on."). The absence of language in the Act abolishing the *Aranda* cause of action does not mean the Legislature intended to do the opposite, that is, to implicitly ratify or approve it.

Moreover, the fact that language abolishing the *Aranda* action was in the bill as it was originally filed indicates at least some legislative support for the Joint Select Committee's recommendation to abolish the action. On the other hand, the dissent points to no language in any iteration of the Act through three legislative

sessions that shows legislative support for ratifying or approving the *Aranda* action. Thus, the dissent's argument that legislative intent to implicitly ratify or approve the *Aranda* action exists because language abolishing it was in the original bill but not the committee substitute is not only speculative as to the reason for the language's being removed, it is also illogical speculation. More logical speculation about the language being in the original bill and removed is that there was legislative support for abolishing the action, while the absence of ratification language in any version of the bill as well as the final enactment indicates there was *no* legislative intent to ratify or approve of the *Aranda* action. But in the final analysis, either argument about legislative intent based on the committee substitute bill can fairly be described as speculative and inappropriate.

Further, legislative intent emanates from the Act as a whole, and not from one isolated portion. *See Harris Cnty. Hosp. Dist. v. Tomball Reg'l Hosp.*, 283 S.W.3d 838, 842 (Tex.2009). At least two parts of the Act indicate the absence of language abolishing the *Aranda* action does not reflect legislative intent to do the opposite and keep it available to litigants. First, the Act specifically provides that under certain circumstances both the WCD and the employee may sue the carrier, and it specifies what either party can recover in such an action. TEX. LAB.CODE § 410.208(a)-(d). If the Legislature intended to ratify or approve an *Aranda* action, it could have made its intent clear by simply saying so in Chapter 416 while it was addressing the issue, just as it said in section 410.208 that both the WCD and employee may sue the carrier. But it did not. Second, one of the major goals of reform and changes made in the Act was to adopt an objective-based standard for determining indemnity benefits in order to reduce disputes and subjective decision

making about them. One of two changes that was the "heart and soul" of the 1989 reforms was "a different method to compute benefits: the shift from the subjective standard of 'loss of wage earning capacity' for redress of injured workers to the more objective use of an impairment schedule for a determination of the recoverable loss caused by a compensable injury." 1 MONTFORD, at 3; *see* TEX. LAB.CODE § 408.122 (providing that impairment income benefits are not recoverable unless based on an objective clinical or laboratory finding); *id.* § 408.124 (providing that impairment income benefits must be based on an impairment rating determined by use of the "Guides to the Evaluation of Permanent Impairment," published by the American Medical Association); *see also Garcia*, 893 S.W.2d at 523 n. 23 (noting the testimony of John Lewis, a workers' compensation expert retained by the Joint Select Committee to evaluate the former system: "What goes on in [the old law] system is inherently subjective. . . . The hope [in fashioning a new system] is to substitute to a greater degree objectivity so there is less reason to argue, the ability to deliver the benefits much more quickly and without the need for litigation." (quoting Meeting of the Legislative Oversight Committee on Workers' Compensation, April 10, 1989, Tape 4 at 2–3)). One of the Legislature's unquestioned goals was to make decisions about benefits as objective as possible, and thereby reduce disputes and litigation over them. The *Aranda* cause of action with its subjective standards for damages is antithetical to such a system, and it has no dispute resolution process other than litigation with its associated delays and expense. Holding that there was legislative intent to implicitly approve or ratify the *Aranda* action because of an *absence* of language either abolishing or approving it would turn logic

on its head when considered in context of the Act as a whole.[16]

In the final analysis, the *Aranda* cause of action is a common law one and it is this Court's prerogative and responsibility to evaluate whether the cause of action continues to be appropriate. That evaluation, in light of the workers' compensation sys-tem being wholly a creation of the Legislature as part of its policy-making function, the Legislature's significant reformation of the system in 1989, and its continual supervision, monitoring, improving, and managing of the system, leads to the conclusion that Texas should join the majority of states that do not allow *Aranda*-type suits in the workers' compensation setting.[17] If

---

**16.** Because the dissent seeks legislative intent outside the words of the statute, it seems that in fairness to the issue it would consider other factors outside the enacted language, or, the non-enacted language on which it relies. But it does not. Other factors would counsel against the conclusion that by its silence the Legislature implicitly ratified or approved the *Aranda* action. For example, ratifying or approving the *Aranda* action would have been diametrically opposed to the finding of the Legislature's Joint Select Committee that the action was detrimental to the goals and interests that had to be balanced in amending the old law, and its recommendation that the action be abolished in favor of a statutory action. *See* Joint Committee Report, at 16.

Another factor not discussed by the dissent is that the existing cause of action was a common law action and legislatively abolishing or abrogating a common law cause of action is a course not lightly undertaken. Allowing abrogation of an injured worker's common law cause of action against his employer in exchange for the adequate and more certain benefits provided by the Act—a cornerstone of workers' compensation law in Texas—was held constitutional in 1916. *See Garcia*, 893 S.W.2d at 521; *Middleton v. Tex. Power & Light Co.*, 108 Tex. 96, 185 S.W. 556, 562 (1916) (upholding constitutionality of the Employers' Liability Act of 1913). But during the years immediately preceding the 71st Legislature, this Court held that various legislative attempts to "cabin-in"—but not completely abolish—certain common law causes of action violated the Texas Constitution. *See Lucas v. U.S.*, 757 S.W.2d 687, 691 (Tex.1988) (holding damages caps in art. 4590i §§ 11.02 and 11.03 as applied to catastrophically injured plaintiffs unconstitutional under due course of law provision); *Neagle v. Nelson*, 685 S.W.2d 11, 12 (Tex.1985) (concluding limitations provision of art. 4590i § 10.01 unconstitutional under open courts provision);

*Nelson v. Krusen*, 678 S.W.2d 918, 922–23 (Tex.1984) (deciding limitations provision of Tex. Ins.Code art. 5.82, § 4 unconstitutional under open courts provision); *Sax v. Votteler*, 648 S.W.2d 661, 665–67 (Tex.1983) (concluding limitations provision in Tex. Ins.Code art. 5.82 as applied to minors unconstitutional under open courts provision). So as of 1989 when the Legislature was struggling to enact reforms, the long-standing construct whereby employees exchanged their common law negligence claims against employers for workers' compensation benefits had withstood constitutional challenge, but recent attempts by the Legislature to place limits on various common law causes of action had not. And opponents of the 1989 reforms promised, and brought, constitutional challenges to the new law. *See Garcia*, 893 S.W.2d at 534 (holding the new Act was constitutional and reversing the court of appeals that had affirmed the trial court's determination that the entire Act was unconstitutional). Taken in context of the times, then, the Legislature's action in even *limiting* an *Aranda* cause of action evidenced significant concern about and intent to control its disruptive effects—not intent to approve of or implicitly ratify it.

**17.** *See, e.g., Everfield v. State Comp. Ins. Fund*, 115 Cal.App.3d 15, 171 Cal.Rptr. 164, 167 (1981); *DeOliveira v. Liberty Mut. Ins. Co.*, 273 Conn. 487, 870 A.2d 1066, 1074 (2005); *Old Republic Ins. Co. v. Whitworth*, 442 So.2d 1078, 1079 (Fla.Dist.Ct.App.1983); *Bright v. Nimmo*, 253 Ga. 378, 320 S.E.2d 365, 368 (1984); *Walters v. Indus. Indem. Co. of Idaho*, 127 Idaho 933, 908 P.2d 1240, 1243 (1996); *Robertson v. Travelers Ins. Co.*, 95 Ill.2d 441, 69 Ill.Dec. 954, 448 N.E.2d 866, 870 (1983); *Sims v. United States Fid. & Guar. Co.*, 782 N.E.2d 345, 349–50 (Ind.2003); *Hormann v. N.H. Ins. Co.*, 236 Kan. 190, 689 P.2d 837, 840 (1984); *Zurich Ins. Co. v. Mitchell*, 712 S.W.2d 340, 341 (Ky.1986); *Kelly v. CNA Ins. Co.*, 729 So.2d 1033, 1034 (La.1999); *Fleming*

the Legislature determines, in its role of managing the workers' compensation system for the benefit of injured workers and employers, that such a cause of action is appropriate as part of the system, we have confidence that legislators will exercise their prerogative to explicitly provide one.

Finally, we disagree with the dissent's statement that we are "replacing the Legislature's judgment with [our] own." 381 S.W.3d at 459 (Jefferson, C.J., dissenting). Contrary to the dissent's assertion, our decision shows deference to and respect for the Legislature's position—and judgment—as the body that created, monitors, and maintains equilibrium in the workers' compensation system by its enactments.

## B. The Insurance Code Claims

The dissent argues that because the Legislature recognized extra-contractual common law claims in chapter 416, "it did not intend to preclude all claims against carriers for proven misconduct" and that the Insurance Code provisions still apply to workers' compensation insurers. 381 S.W.3d at 464 (Jefferson, C.J., dissenting). We agree that the new Act's language does not purport to preclude all types of claims against workers' compensation insurers. For example, Insurance Code section 541.061 applies to them. And the Act itself contains provisions for additional claims against insurers. However, for the reasons we have explained above, sections 541.060 and 542.003 of the Insurance Code

simply are not compatible with amended detailed procedural and substantive provisions of the new Act.

## VII. Conclusion

The judgment of the court of appeals is reversed. We render judgment that Ruttiger take nothing.

Justice WILLETT filed a concurring opinion.

Chief Justice JEFFERSON filed a dissenting opinion, in which Justice MEDINA, Justice GREEN, and Justice LEHRMANN joined.

Justice WILLETT, concurring.

I join the Court's opinion but write separately on Part V to emphasize this overlooked truism: It is principally the judiciary's role to define and delimit common-law causes of action. In our constitutional design, the judicial branch is a partner, but not a junior partner [1]—and shaping Texas common law is fundamentally a judicial prerogative.

\*  \*  \*

Today the Court overrules *Aranda v. Insurance Co. of North America*[2] and holds a common-law action for bad faith is no longer warranted in the workers' compensation context. I agree. The dissent avers the proper inquiry is whether the Legislature intended to abrogate extra-statutory *Aranda* claims when it amended the Workers' Compensation Act in 1989. Respectfully, this focus on legislative ac-

---

*v. Nat'l Union Fire Ins. Co.*, 445 Mass. 381, 837 N.E.2d 1113, 1121 (2005); *Gallagher v. Bituminous Fire & Marine Ins. Co.*, 303 Md. 201, 492 A.2d 1280, 1283–84 (1985); *Denisen v. Milwaukee Mut. Ins. Co.*, 360 N.W.2d 448, 450 (Minn.Ct.App.1985); *Young v. U.S. Fid. & Guar. Co.*, 588 S.W.2d 46, 48 (Mo.Ct.App. 1979); *Ihm v. Crawford & Co.*, 254 Neb. 818, 580 N.W.2d 115, 116 (1998); *Burlew v. Am. Mut. Ins. Co.*, 63 N.Y.2d 412, 415, 482

N.Y.S.2d 720, 472 N.E.2d 682 (N.Y.1984); *see also Whitten v. Am. Mut. Liab. Ins. Co.*, 468 F.Supp. 470, 475 (D.S.C.1977) (applying South Carolina law).

1. *In re Allcat Claims Serv., L.P.*, 356 S.W.3d 455, 475 (Tex.2011) (Willett, J., concurring in part and dissenting in part).

2. 748 S.W.2d 210 (Tex.1988).

tion is misplaced, at least in this case. To be sure, the Legislature has some power to override or otherwise limit common-law remedies.[3] However, this is a high hurdle, one clearly uncleared here.[4] As such, the search for some *legislative* suggestion on whether *Aranda* should survive—an inquiry both the majority and the dissent eventually entertain—is at best fruitless, and at worst, dangerously speculative.[5] The more proper inquiry, respectfully, is whether the Court believes *Aranda* still has a place, not whether the Legislature believes so.

Statutory abrogation is not the sole way to re-think a common-law cause of action. In determining the continued vitality of the bad-faith remedy in workers' compensation cases, I would pivot on something simpler: this Court's nonpareil role as arbiter of the common law. It is the duty of the *judicial* branch to declare what the common law is: "The law is not static; and the courts, whenever reason and equity demand, have been the primary instruments for changing the common law through a continual re-evaluation of common law concepts in light of current conditions."[6] This charge is indeed an ongoing one: "[T]he common law is not frozen or stagnant, but evolving, and it is the duty of this [C]ourt to recognize that evolution."[7] Accordingly, we are called upon to reevaluate common-law rules, giving deference to *stare decisis* when warranted, but departing when the prior rule no longer furthers the interests of efficiency, fairness, and legitimacy.[8] As we noted 142 years ago, "When the reason of the rule fails, the rule itself should cease. *Cessante ratione legis, cessat ipsa lex.*"[9]

This axiom is sufficient to resolve today's case because, as the Court so ably details, the "reason" behind *Aranda* is no more. When we extended the duty of good faith and fair dealing to workers' compensation carriers in *Aranda*, we did so because of the "special trust relationship" between a carrier and an employee.[10] This relationship does not exist in every contractual agreement, but we recognized it in the workers' compensation context because of employees' particular vulnerability. Under the pre–1989 comp

---

3. *See Middleton v. Tex. Power & Light Co.*, 108 Tex. 96, 185 S.W. 556, 560–61 (1916).

4. *See Cash Am. Int'l Inc. v. Bennett*, 35 S.W.3d 12, 16 (Tex.2000).

5. The separate writings here demonstrate—again—the perils of consulting legislative history. The Court criticizes the dissent for relying on changes made to a bill during the legislative process, calling it "illogical speculation." *Ante* at 454. But one sentence later, the Court posits an alternate explanation for the same legislative history, declaring it "[m]ore logical speculation." *Id.* Though the Court rightly dismisses both arguments as inappropriate, this is yet another reminder that legislative history, often turbid and thus prone to contrivance, serves as an ever-present judicial mercenary, embraced when helpful and ignored when not. As Justice Robert Jackson wryly observed, "It is a poor cause that cannot find some plausible support in legislative history." Robert H. Jackson, *Problems of Statutory Interpretation*, 8 F.R.D. 121, 125 (1948); *see also Exxon Mobil Corp. v. Allapattah Servs.*, 545 U.S. 546, 568, 125 S.Ct. 2611, 162 L.Ed.2d 502 (2005) (repeating Judge Leventhal's memorable phrase that rummaging around in legislative minutiae resembles "looking over a crowd and picking out your friends" (internal citations omitted)).

6. *Whittlesey v. Miller*, 572 S.W.2d 665, 668 (Tex.1978).

7. *El Chico Corp. v. Poole*, 732 S.W.2d 306, 310 (Tex.1987).

8. *See Sw. Bell Tel. Co. v. Mitchell*, 276 S.W.3d 443, 447 (Tex.2008).

9. *Wright's Adm'x v. Donnell*, 34 Tex. 291, 306 (1870).

10. *Aranda*, 748 S.W.2d at 212.

system, there was a tremendous disparity of bargaining power, leaving employees with little to no recourse against arbitrary payment decisions.[11] Concerned with such inadequacies, we allowed a common-law remedy for bad faith to fill the gap.

A year later, the gap was made less gaping. Observers may dispute whether the Legislature's 1989 overhaul *eliminated* the bargaining disparity between carriers and employees, but it is indisputable that the top-to-bottom reforms enacted then (and since) have *lessened* the concerns that animated *Aranda.* By providing a strict dispute resolution timeline, a mechanism for interlocutory benefits, penalties for myriad carrier misdeeds, assistance for injured workers, and a litany of other protections throughout the Labor and Insurance Codes, the Legislature has endeavored to occupy the realm of claims handling and reduce the inequities that drove us to announce a common-law duty. My review today of the Legislature's pervasive workers' comp regime convinces me that (1) *Aranda*'s concerns with carrier misbehavior have been addressed, and therefore (2) *Aranda*'s cumulative extra-statutory remedy should now recede.

Otherwise, there is a very real possibility that the continued existence of bad-faith claims will subvert the Legislature's meticulous soup-to-nuts system, one augmented by an immense regulatory and adjudicatory framework that, taken together, now regulates virtually every aspect of how a carrier handles a workers' comp matter.

In the past, this Court has been hesitant to extend common-law causes of action into fields where a pervasive regulatory scheme controls, specifically because of this potential for interference.[12] We should exercise similar deference when considering whether to draw back an extra-statutory remedy in light of legislative changes.

The Legislature's radical 1989 restructuring certainly made room for our 1988 *Aranda* decision, but that to me suggests not affirmation but accommodation. In any case, whether lawmakers acknowledged *Aranda* out of politeness (the Supreme Court says bad-faith claims must exist) or deliberateness (the Legislature agrees such claims must exist), it is *our* decision whether the bad-faith remedy retains any role as a leveler or equalizer within a pervasive statutory scheme that controls claims handling in minute detail and bears little resemblance to the inequitable pre-*Aranda* landscape.

Our 2010 *Waffle House* decision is instructive. There, we considered whether the plaintiff could bring a common-law negligence claim against her employer in light of the TCHRA's "unique set of substantive rules and procedures" governing sexual harassment.[13] We answered that she could not after determining that the differences between the two causes of action—in procedure, and standards, and remedies—were "manifold."[14] Because of those differences, we rejected the common-law claim for fear of circumventing

---

11. *Id.* at 212–13.

12. *See Waffle House, Inc. v. Williams,* 313 S.W.3d 796, 804 (Tex.2010) (noting that an extra-statutory negligence claim would "collide with the elaborately crafted statutory scheme" covering workplace harassment); *City of Midland v. O'Bryant,* 18 S.W.3d 209, 216 (Tex.2000) (declining to impose a duty of good faith and fair dealing on the employment relationship because that "would tend

to subvert those [statutes regulating the employment relationship] by allowing employees to make an end-run around the procedural requirements and specific remedies the existing statutes establish").

13. *See Waffle House,* 313 S.W.3d at 803–04.

14. *Id.* at 805–07.

the "meticulous legislative design." [15] We could apply the same analysis here because the inherently fuzzy nature of the bad-faith tort has a tendency to produce conflicting liability standards inconsistent with the Legislature's statutory approach to carrier malfeasance and accountability.[16] I think it unwise to invite these potential complications, particularly in an area so imbued with public policy trade-offs, and where the Legislature has specifically addressed our concerns over how comp claims are processed.

\* \* \*

*Aranda* was rooted in specific claims-handling inequities in the pre–1989 comp system, inequities the Legislature has rebalanced. Accordingly, in light of the Legislature's hermetic workers' compensation regime, the time has come for the Court—exercising *its* authority to define and delimit common-law remedies—to overrule *Aranda,* a judicial gap-filler whose underlying rationale no longer exists.

Chief Justice JEFFERSON, joined by Justice MEDINA, Justice GREEN, and Justice LEHRMANN, dissenting.

Timothy Ruttiger allegedly sustained a work-related injury. Because of various complaints about how the Texas Mutual Insurance Company (TMIC) processed his workers' compensation claims, Ruttiger sued under the common law and chapters 541 and 542 of the Insurance Code, alleging that TMIC breached its duty of good faith and fair dealing.

TMIC and its amici ask us to hold that the Texas Workers' Compensation Act is the exclusive remedy for all work-related injuries, thus precluding Ruttiger's suit. We have previously concluded that both the Insurance Code and common law claims are viable—indeed, that they complement the workers' compensation system. Even after the 1989 overhaul, the Act's express language makes plain the Legislature's intent that common law bad faith claims remain available to litigants. As for Ruttiger's Insurance Code claims, the Code's language makes clear that they apply, and the Act's exclusivity provision does not apply to insurance carriers. Far from having precluded such claims, then, the Legislature has continued to recognize actions like Ruttiger's.

Today the Court holds that most of Ruttiger's Insurance Code claims (and, as a result, his dependent DTPA claims) are no longer viable. The Court also eliminates Ruttiger's common law good-faith-and-fair-dealing claim. The Court makes persuasive policy arguments to support its decision, replacing the Legislature's judgment with its own. I would hold that both claims survived the Legislature's 1989 workers' compensation overhaul and would affirm the court of appeals' judgment. Because the Court does otherwise, I respectfully dissent.

## I. The Old Workers' Compensation System

In 1987, we first considered whether a workers' compensation claimant could sue a carrier who engaged in a deceptive trade practice. *Aetna Cas. & Sur. Co. v. Marshall,* 724 S.W.2d 770 (Tex.1987). Inter-

---

**15.** *Id.* at 805.

**16.** *See Universe Life Ins. Co. v. Giles,* 950 S.W.2d 48, 62–65 (Tex.1997) (Hecht, J., concurring) (observing that bad-faith actions are often seen as "the judicial equivalent of the Wheel of Fortune" because the jury determines the facts *and* the standards to be ap-

plied on an *ad hoc* basis); *see also Waffle House,* 313 S.W.3d at 804 (noting that the workers' compensation scheme incorporates a legislative attempt to balance the various interests and concerns of employees and employers).

preting former article 21.21 of the Insurance Code, the predecessor to chapter 541, we said that claims under that article were not foreclosed by the existence of the workers' compensation system. *Id.* at 772. We held that the statute's text "provide[d] a cause of action to a person who has been injured by an insurance carrier who engage[d] in" a deceptive trade practice. *Id.* As to the carrier's arguments that the workers' compensation system barred the employee's claim, we held that the "mere fact that Marshall was injured while working should not be used as a shield" to preclude Marhall's recovery for the separate injury he suffered as the result of the carrier's deceptive practices. *Id.*

The next year, in *Aranda v. Insurance Co. of North America,* 748 S.W.2d 210 (Tex.1988), we considered the more controversial question of whether an employee could sue a workers' compensation carrier for a breach of the common law duty of good faith and fair dealing. We held that such claims were viable. *Id.* at 215. Interpreting the former workers' compensation statute's exclusivity provision, we held that it "was not intended to shield compensation carriers from the entire field of tort law" and that it could not "be read as a bar to a claim that is not based on a job-related injury." *Id.* at 214. Expanding on this point, we emphasized that the workers' compensation statute was exclusive only as to job-related injuries, which are separate from injuries suffered as the result of a carrier's breach of duty:

> Liability as a result of a carrier's breach of the duty of good faith and fair dealing or intentional misconduct in the processing of a compensation claim is distinct from the liability for the injury arising in the course of employment. Injury from the carrier's conduct arises out of the contractual relationship between the carrier and the employee and is *sustained after the job-related injury.*

*Id.* (emphasis added). "A claimant," we held, "is permitted to recover when he shows that the carrier's breach ... is separate from the compensation claim and produced an independent injury." *Id.* We also concluded that the possibility of administrative penalties did not suggest that common law claims were precluded because the penalties did not afford relief from the particular injuries the claimant alleged. *Id.* at 215.

## II. The New Workers' Compensation Act

The Legislature overhauled our workers' compensation scheme in 1989. The Legislature examined the successes and failings of the previous system, commissioning a number of studies and reports to address what was driving the system's high cost. Several of these studies suggested legislative displeasure with *Aranda,* which was cited as a source of rising costs. One legislative report noted that "Texas law allows more cases to be adjudicated outside the scope of the workers' compensation law than laws of other states." Joint Select Committee on Workers' Compensation Insurance, A Report to the 71st Legislature 3 (Dec. 9, 1988). As such, the report suggested that the Legislature "[p]rovide that bad faith handling of claims is not grounds for a suit outside the workers' compensation act." *Id.* at 16. Another report addressed the issues raised by *Marshall,* suggesting that the Legislature "[e]liminate extra contractual liability resulting in treble damage suits under the Deceptive Trade Practices–Consumer Protection Act and the Unfair Claim Settlement Practices Act." House Select Interim Committee on Workers' Compensation Insurance, Interim Report to the 70th

LEGISLATURE 41 (Jan. 1987).[1]

The first draft of the new Act adopted the Joint Select Committee's recommendation that common law claims be precluded. The bill as introduced permitted an administrative penalty to be assessed against carriers for "malice or bad faith" in claims-processing, and it made clear that this penalty constituted "the employee's exclusive remedy against the employer *or carrier*" for such conduct. Tex. H.B. 1, 71st Leg., R.S., § 11.12 (1989) (emphasis added). However, the committee substitute removed that provision, opting instead for language that simply limited *Aranda.* Tex.C.S.H.B. 1, 71st Leg., R.S., §§ 10.41, 10.42 (1989). It was this limiting language that ultimately passed, with some changes, as part of the new Act. Texas Workers' Compensation Act, 71st Leg., 2d C.S., ch. 1, 1989 Tex. Gen. Laws 1 (codified at TEX. LAB.CODE 401–19).[2]

### III. The Common Law Claims

The Court's analysis of common law claims can only properly be considered in light of *Aranda* and with deference to the Legislature's express recognition, in chapter 416 of the Labor Code, that this avenue of relief endures. The Court asks whether the extra-contractual claims fit with the statutory scheme. This is the wrong inquiry entirely. The question pre-

sented in this case is whether the Legislature intended to abrogate entirely a common law bad faith remedy when it enacted the Workers' Compensation Act. Given the existence of chapter 416, it is impossible to conclude that the Legislature had such an intent.

We have repeatedly addressed situations in which common law claims and statutory remedies seem to overlap, and we have embraced a framework to guide our analysis in such cases. The touchstone of this analysis, as in all statutory interpretation, is legislative intent. We start with the proposition that statutes abrogating common law causes of action are disfavored. *Cash Am. Int'l Inc. v. Bennett,* 35 S.W.3d 12, 16 (Tex.2000). A statute banishing a common law right "'will not be extended beyond its plain meaning or applied to cases not clearly within its purview.'" *Id.* (quoting *Satterfield v. Satterfield,* 448 S.W.2d 456, 459 (Tex.1969)). Abrogation by implication is disfavored. *Id.* For that reason, courts must examine whether the statute's language "indicate[s] clearly or plainly that the Legislature intended to replace" a common law claim with an exclusive statutory remedy, and we "decline[ ] to construe statutes to deprive citizens of common-law rights unless the Legislature clearly expressed that intent."[3] *Id.*

---

1. Similarly, a report published after the passage of the new Act by Senator John Montford, the primary author of the overhaul legislation, made clear that the Legislature, in passing the new law, had considered *Aranda*'s impact: "Following *Aranda,* a rational and common response for carriers was less resistance not only to paying questionable claims, but also to paying more to settle comp claims than their reasonable value." 1 JOHN T. MONTFORD ET AL., A GUIDE TO WORKERS' COMP REFORM § 4.2(a)(7) (1991); *see also id.* § 4.2(b)(7) ("In sum, *Aranda* dramatically shifted the relative negotiating positions between the claimant and carrier.").

2. The language limiting *Aranda* was codified as chapter 416 of the Labor Code.

3. We have applied this framework repeatedly. For example, in *Lopez,* which the Court cites but then seems to forget about, we noted that "[w]hether a regulatory scheme is an exclusive remedy depends on whether 'the Legislature *intended* for the regulatory process to be the exclusive means for remedying the problem to which the regulation is addressed.'" *City of Waco v. Lopez,* 259 S.W.3d 147, 153 (Tex.2008) (quoting *In re Sw. Bell Tel. Co.,* 235 S.W.3d 619, 624–25 (Tex.2007)) (emphasis added). Likewise, in *Waffle House, Inc. v.*

We must decide, then, whether there is "clear legislative intent," *Dealers Elec. Supply Co. v. Scoggins Constr. Co.*, 292 S.W.3d 650, 660 (Tex.2009), to extinguish entirely this settled common law remedy. As amended by the Workers' Compensation Act, the Labor Code provides:

> An action taken by an insurance carrier under an order of the commissioner or recommendations of a benefit review officer under Section 410.031, 410.032, or 410.033 may not be the basis of a cause of action against the insurance carrier *for a breach of the duty of good faith and fair dealing.*

Tex. Lab.Code § 416.001 (emphasis added). The fact that certain bad faith claims are thereby eliminated requires the logical inference that others survive. Likewise, the Code's limits on exemplary damages "[i]n an action against an insurance carrier for a breach of the duty of good faith and fair dealing," *id.* § 416.002, implies that other damages remain available. In the context of our precedent, there is but one conclusion to be drawn from these provisions: the Legislature *did not* intend to abrogate the common law claims. To the contrary,

the Legislature, in the clearest way possible, *limited Aranda*-type claims, rather than abolished them.[4]

The inquiry ends there. If the Legislature limited *certain Aranda*-type claims, it could not logically have also intended to eliminate *all of them.* The Act's structure further supports this conclusion.

The exclusivity provision of the new Act provides that "[r]ecovery of workers' compensation benefits is the exclusive remedy of an employee covered by workers' compensation insurance coverage … *against the employer* … [for] a work-related injury sustained by the employee." Tex. Lab. Code § 408.001 (emphasis added). This clause thus emphasizes two important aspects of the old law: (1) it provides that workers' compensation is exclusive *only with respect to the employer,* and (2) it retains the distinction, important to our decisions in *Aranda* and *Marshall,* between a "work-related injury" and an injury caused by a carrier's misconduct. *See id.* A logical inference from this provision, which bars claims against employers, is that claims against carriers may proceed. Indeed, *Aranda,* analyzing the old Act's

---

*Williams,* 313 S.W.3d 796, 802 (Tex.2010), we held that "the legislative creation of a statutory remedy is not presumed to displace common-law remedies. To the contrary, abrogation of common-law claims is disfavored." Acknowledging the centrality of legislative intent, *see id.* at 809 n. 66, we looked at the statute's "meticulous legislative design," *id.* at 805. Similarly, we have held that "absent *clear legislative intent* we have declined to construe statutes to deprive citizens of common-law rights." *Dealers Elec. Supply Co. v. Scoggins Constr. Co.*, 292 S.W.3d 650, 660 (Tex.2009) (emphasis added). We have also written that "statutes can modify common law rules, but before we construe one to do so, *we must look carefully to be sure that was what the Legislature intended."* *Energy Serv. Co. of Bowie v. Superior Snubbing Servs., Inc.*, 236 S.W.3d 190, 194 (Tex.2007) (emphasis added); *see also, e.g., Emps. Ret. Sys. of Tex. v. Duenez,* 288 S.W.3d 905, 919 (Tex.2009) (the

proper inquiry is legislative intent); *Pruett v. Harris Cnty. Bail Bond Bd.*, 249 S.W.3d 447, 454 (Tex.2008) (same); *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 208 (Tex.2002) (same).

4. The House Committee that considered the Act referred to the provisions as "provid[ing] *limitations* in actions against a carrier for breach of duty." House Comm. on Bus. & Commerce, Bill Analysis, S.B. 1, 71st Leg., 2d C.S. (1989) (emphasis added). Senator Montford was even more explicit, noting that the provisions were meant to "temper" *Aranda:*

> In the very important Article 10 of the 1989 Workers' Compensation Act are provisions … provid[ing] procedures and implementing provisions assessing … administrative penalt[ies] … [and] temper[ing] the liability of a comp carrier for breach of good faith/fair dealing under *Aranda.* …

2 Montford, § 10.0 (footnotes omitted).

exclusivity provision, recognized exactly this, holding that the injury alleged in a common law suit is wholly separate, both conceptually and temporally, from the job-related injury to which the exclusivity provision, and the workers' compensation system as a whole, applied. *Aranda,* 748 S.W.2d at 214 ("Injury from the carrier's conduct arises out of the contractual relationship between the carrier and the employee and is sustained after the job-related injury.").

The existence of administrative penalties that can be assessed against workers' compensation carriers does not mandate the contrary. *See* TEX. LAB.CODE ch. 415 (creating administrative penalties for certain acts by employers, carriers, and other parties). The Insurance Code allows for substantially similar administrative penalties against insurers operating outside of the workers' compensation system, *see* TEX. INS.CODE § 84.021 (providing for the imposition of administrative penalties for violations of the insurance code and other insurance laws), but we have never held the existence of those penalties precludes the claims at issue here when made against those insurers.[5]

As shown by the presence of chapter 416, not to mention the Act's legislative history and the language of its exclusivity clause, the Legislature pointedly recognized the availability of claims outside of the Act. Therefore, we cannot legitimately conclude that the Legislature intended for the Act to be an exclusive remedy with regard to carriers. If the Act's "comprehensive" administrative scheme had been intended to preclude the common law claims permitted in *Aranda,* there would have been no need for the Legislature to enact chapter 416. *Cf. Cameron v. Terrell & Garrett, Inc.,* 618 S.W.2d 535, 540 (Tex. 1981) ("[I]f the Act already excluded [the] defendants who do not furnish the goods or services, ... there would have been no need for the legislature to exempt media defendants from liability....."). Indeed, it appears that the penalty provisions and the limitations on *Aranda* were seen as complementary. The 1989 Act, then, did not repudiate, but rather acknowledged, the viability of extra-contractual claims against workers' compensation insurance carriers. This is enough to decide the case before us.

## IV. The Insurance Code Claims

TMIC's primary argument against the Insurance Code's applicability to its conduct is the same argument it made with regard to the common law: that the workers' compensation system is so comprehensive that all remedies outside of the Act

---

5. Indeed, each of the particular penalties that the Court says may be assessed against workers' compensation carriers may also be assessed against other insurers. Insurers may be fined for any violation of the Insurance Code, TEX. INS.CODE § 84.021, and that Code specifically prohibits unfair settlement practices. *Compare* TEX. LAB.CODE §§ 409.021, 415.002 (permitting administrative penalties for unfair claims-settlement practices), *with* TEX. INS.CODE § 541.060 (prohibiting unfair settlement practices).

Moreover, the existence of the penalty regime actually clarifies the Legislature's intent *not* to broadly preclude claims under the common law and Insurance Code against workers' compensation carriers. As the Court notes, 381 S.W.3d at 454, failure to comply with a Division order is grounds for an administrative penalty, and a claimant may bring suit to enforce such an order and may be awarded attorney's fees and a twelve percent penalty. TEX. LAB.CODE § 410.208. It is in this lone context—where judicial enforcement is expressly permitted—that the Legislature by statute prohibited claimants from bringing common law claims. *Id.* § 416.001 (barring claims against a workers' compensation carrier for breach of the duty of good faith and fair dealing if the claims are based on actions taken by the carrier pursuant to Division orders).

are necessarily excluded.[6] This is unconvincing. In addition to the fact that the Act is not, by its terms, an exclusive remedy with respect to carriers, *see* TEX. LAB. CODE § 408.001, the Legislature's recognition of extra-contractual common law claims in chapter 416 makes clear that it did not intend to preclude all claims against carriers for proven misconduct. *See City of Waco v. Lopez*, 259 S.W.3d 147, 153 (Tex.2008) (holding that we look for legislative intent that a claim be precluded). The Legislature was aware of—and concerned with—our decisions in both *Aranda* and *Marshall*, but it did not endeavor to override them. If the Workers' Compensation Act is not exclusive with respect to carriers, there is no basis upon which to hold that Insurance Code claims

are now precluded in this context. Moreover, though we were concerned with the issue of exclusivity in *Aranda*, we decided *Marshall* primarily on the basis of the Insurance Code's text. We held, quite plainly, that the Insurance Code "provides that a person who has sustained actual damages as a result of another's deceptive acts or practices may maintain a suit for treble damages." *Marshall*, 724 S.W.2d at 772. Nothing in the Workers' Compensation Act overcame the Insurance Code's plain language, and, therefore, we held that a carrier could not use the Act "as a shield" from liability. *Id.* Notwithstanding the Court's overruling of *Marshall* today, the Insurance Code's provisions still apply, and, as such, the Court's preemption approach is without merit.[7]

6. Though the Court credits this argument, I believe that TMIC failed to properly preserve this issue and that it therefore should not be considered in this Court. Texas Rule of Appellate Procedure 53.2(f) provides that the petition for review

> must state concisely all issues or points presented for review. The statement of an issue or point will be treated as covering every subsidiary question that is fairly included. If the matter complained of originated in the trial court, it should have been preserved for appellate review in the trial court and assigned as error in the court of appeals.

*See also* TEX.R.APP. P. 33.1 (preserving issues for appellate review); *id.* R. 38.1(f) (requiring appellant to "state concisely all issues or points presented for review" in the court of appeals). TMIC, however, did not raise this argument in the court of appeals, instead challenging the judgment on the Insurance Code violations based only on the sufficiency of the evidence. *Cf. Equistar Chems., L.P. v. Dresser–Rand Co.*, 240 S.W.3d 864, 868 (Tex. 2007) (holding that the defendant's no-evidence objections at the trial court did not preserve error as to its related legal arguments). Indeed, in the court of appeals, TMIC argued only that Ruttiger's common law claims—and not his Insurance Code claims—were not legally cognizable. TMIC's arguments about the unavailability of reme-

dies under the Insurance Code were raised for the first time on appeal in its Reply Brief in Support of the Petition for Review. As such, they do not meet the requirements of Rule 53.2(f). *See* TEX.R.APP. P. 53.2(f). The Court holds that TMIC's legal sufficiency challenge preserved error on this point (although, inexplicably, the Court holds that error was not preserved as to another of TMIC's Insurance Code claims). If that is enough, there is little that a legal sufficiency challenge will *not* preserve. For the sake of argument, I presume the issue is properly before us.

7. TMIC additionally argues that Ruttiger's claims are precluded by *Aranda*'s independent injury requirement and that they are not among a narrow class of injuries recognized by *Aranda*. Neither of these contentions is correct. In *Aranda*, we wrote that an "[i]njury from the carrier's conduct arises out of the contractual relationship between the carrier and the employee and is sustained after the job-related injury." 748 S.W.2d at 214. Thus, a "claimant is permitted to recover when he shows that the carrier's breach of the duty of good faith and fair dealing . . . is separate from the compensation claim and produced an independent injury." *Id.* The jury found that Ruttiger was injured when the carrier breached its duty, and it found that he sustained damages as a direct result of his injuries. Moreover, Ruttiger's damages are

## V. Conclusion

Whether allowing extra-contractual claims makes sense is a different question than whether the laws, as written, permit their pursuit. The Court correctly observes that the Act carefully balances competing interests. The Legislature struck that balance by acknowledging and limiting the common law claims the Court abolishes today. In doing so, the Court disrupts the statutory equilibrium and substitutes its judgment for the Legislature's. The concurrence agrees that *Aranda* should be overruled because "there is a very real possibility that the continued existence of bad-faith claims will subvert the Legislature's meticulous soup-to-nuts system." 381 S.W.3d at 458 (Willett, J., concurring). But it cannot be "subversion" to recognize the continued vitality of a remedy that the Legislature took into account when creating that system. The Legislature's comprehensive overhaul used *Aranda* as its foundation, and *Aranda* has coexisted with the "new" Act during the twenty-three years since its passage. Stare decisis does not interfere with the statutory scheme—overruling the case does. Because the Legislature has not made the Act exclusive with respect to extra-contractual claims, I would not eliminate Ruttiger's claims and would affirm the court of appeals' judgment. Because the Court does otherwise, I respectfully dissent.

not the sort of "lost compensation benefits" we said could not be recovered in *Saenz v. Fidelity & Guaranty Insurance Underwriters*, 925 S.W.2d 607, 612 (Tex.1996). I agree with the court of appeals on this issue for the

reasons stated in its decision. 265 S.W.3d 651. Finally, I agree with this Court that Ruttiger exhausted his administrative remedies, and the trial court had jurisdiction over this suit.