**Petition for Writ of Mandamus Denied and Majority and Dissenting Opinions filed August 4, 2025.**



In The

# Fifteenth Court of Appeals

_____

## NO. 15-24-00091-CV

_____

## IN RE OFFICE OF THE ATTORNEY GENERAL OF THE STATE OF TEXAS, Relator

---

**ORIGINAL PROCEEDING**
**WRIT OF MANDAMUS**
**139th District Court**
**Hidalgo County, Texas**
**Trial Court Cause No. C-2639-24-C**

---

## DISSENTING OPINION

In most cases, a trial court has broad discretion to grant or deny a pre-suit deposition based on whether the likely benefit outweighs the burden or expense of the deposition. But this case is different from most cases. For four years, a state of disaster has existed in our border counties due to the flood of persons lawfully or

unlawfully crossing the Rio Grande. The Office of the Attorney General ("OAG") seeks to investigate whether a charitable corporation in Hidalgo County has—or has not—been using some of the tens of millions of dollars it receives in federal funding to harbor or transport persons unlawfully in the state.

I agree with the Court that nothing grants OAG authority to demand a pre-suit deposition in all corporate investigations. But in this extraordinary case—where the Attorney General of Texas in response to a *specific request* by the Governor of Texas *during* a state crisis requests a pre-suit deposition to investigate a colorable claim that a corporation is *violating* state law and *contributing* to the crisis—it is an abuse of discretion for courts to deny it absent some extraordinary burden on the deponent. There is no such evidence here, so I would conditionally grant relief.

## I.      Did the trial court err in applying Rule 202?

Rule 202 is "the broadest pre-suit discovery authority in the country."[1] But it cannot be construed so broadly as to allow "anyone in the world to investigate anyone else in the world."[2] A *pre-suit* deposition requires additional findings that *pre-trial* depositions do not: either that (1) the deposition "may prevent a failure or delay of justice" (which OAG does not allege), or (2) "the likely benefit" of the deposition "outweighs the burden or expense of the procedure"[3] (which it does).

Both parties address the benefits and burdens of pre-suit depositions in general cases. OAG argues that a single pre-suit deposition to determine if a corporation is violating state law would be quicker and cheaper than filing a lawsuit to obtain full pretrial discovery. The corporation argues that a pre-suit deposition would "impose a substantial burden" on the organization, require "considerable time and effort,"

---

[1]      *In re Doe*, 444 S.W.3d 603, 610 (Tex. 2014).

[2]      *Id.*

[3]      TEX. R. CIV. P. 202.4(a).

and "force a leader of the organization to step away from her obligations." Standing alone, these arguments might not justify a pre-suit deposition.

But they don't stand alone here. Subsection 5 of Rule 202 incorporates the general rules limiting discovery *after* filing into this *pre*-filing rule: "The scope of discovery in depositions authorized by this rule is the same as if the anticipated suit or potential claim had been filed."[4] Rule 192.4 governs the scope of post-filing discovery, and requires courts to weigh the "likely benefits" of discovery against the "burdens and expenses" of it—*exactly* the same test as in Rule 202—but adds further details of what that balance ought to include:

> The discovery methods permitted by these rules should be limited by the court if it determines, on motion or on its own initiative and on reasonable notice, that:
>
> (a) the discovery sought is unreasonably cumulative or duplicative, or is *obtainable from some other source* that is more convenient, less burdensome, or less expensive; or
>
> (b) the burden or expense of the proposed discovery outweighs its likely benefit, taking into account the needs of the case, the amount in controversy, the parties' resources, *the importance of the issues at stake* in the litigation, and the importance of the proposed discovery in resolving the issues.[5]

Part (a) of Rule 192.4 asks whether the requested discovery can be obtained in a "more convenient, less burdensome, or less expensive" manner; part (b) asks whether the exceptional nature and importance of a dispute justifies exceptional discovery. Neither supports denial of the pre-suit deposition here.

## A. The border crisis

"Rule 202 depositions are not now and never have been intended for routine

---

4    TEX. R. CIV. P. 202.5.

5    *Id.* R. 192.4 (emphasis added).

3

use,"[6] but this case is not routine. It arises out of a state-declared disaster, one that as OAG points out presents "an issue of monumental importance and one that Governor Abbott expressly asked OAG to investigate."

Four years ago on May 31, 2021, Texas Governor Greg Abbott issued the first of many declarations of a state of disaster along the state's entire border with Mexico, declaring that

> the ongoing surge of individuals unlawfully crossing the Texas-Mexico border poses an ongoing and imminent threat of widespread and severe damage, injury, and loss of life and property, including property damage, property crime, human trafficking, violent crime, threats to public health, and a violation of sovereignty and territorial integrity[.][7]

The declaration stated that in the first three months of Operation Lone Star, "DPS has made over 1,300 criminal arrests, apprehended over 35,000 illegal migrants, and seized over 10,000 pounds of drugs and over 100 firearms."[8] The decree called on all state and local governments and law enforcement to use "all available resources . . . to assist and protect Texans from criminal activity and property damage."[9] Because by state law disaster declarations expire in 30 days unless renewed,[10] Governor Abbott has renewed the declaration 55 times, extending it most recently on July 21, 2025, to include 69 of the state's 254 counties.[11]

---

6      *In re Jorden*, 249 S.W.3d at 423.

7      The Governor of the State of Texas, Proclamation No. 41-3822, 46 Tex. Reg. 3653, 3658 (2021).

8      *Id*. at 3657.

9      *Id.* at 3658.

10      TEX. GOV'T CODE § 418.014(c).

11      The Governor of the State of Texas, Proclamation No. 41-4220 (2025), available at, https://gov.texas.gov/news/post/governor-abbott-renews-border-security-disaster-proclamation-in-july-2025 (last visited July 31, 2025).

There is no dispute that the Rule 202 deposition here is intended to investigate a potential contributing factor to that crisis. OAG alleged in its petition that the corporation here "appears to be one of the major NGOs operating at the Texas-Mexico border and assisting immigrants seeking to enter the United States." The corporation does not dispute that it is a major provider of such services. Its records are spotty but nevertheless show that in July of 2019 it served 18,945 "unique migrants" (an average of 611 per day), and a letter signed by its Executive Director in April of 2023 stated that it anticipated "receiving between 1,500 to 2,000" asylum seekers daily when COVID-19 restrictions at the border were lifted.

The corporation provides food, shelter, clothing, and other services to thousands of people who need them, often desperately. But the focus of OAG's investigation is whether it may also be transporting or harboring "aliens who have not been processed by Border Patrol as part of an effort to conceal them from law enforcement." If so, that would violate the state's criminal law.[12]

The corporation complains that OAG failed to produce "a single piece of evidence . . . suggesting any wrongdoing." But producing evidence is the *purpose* of a pre-suit deposition, not a *precondition* for it. Like any other petition, a Rule 202 petition requires that an attorney certify that it "is not groundless and brought in bad faith or groundless and brought for the purpose of harassment."[13] It would be odd if litigants had to produce *more* evidence to certify a petition for a pre-suit deposition than is required for the anticipated suit itself.

As noted above, Rule 202.5 incorporates the discovery limits of Rule 192.4(b), including "the importance of the issues at stake in the litigation."[14] This is

---

[12]     *See* TEX. PENAL CODE § 20.05(a)(1), (2).

[13]     TEX. R. CIV. P. 13.

[14]     *See id.* R. 192.4(b), 202.5.

one of the most critical factors in deciding whether requested discovery is too much or not enough.[15] There appears to be no other published Texas case considering a pre-suit deposition in the context of an existing state of disaster. As a matter of law, a disaster raises the importance of any case that might help mitigate it, and justifies discovery beyond that which would be reasonable in everyday circumstances.

I do not discount the importance of the corporate charity's humanitarian services here, or that "[e]very hour spent responding to the Attorney General is an hour not spent performing services in pursuit of the corporation's religious and charitable mission." But if that alone were sufficient, it would prevent pre-suit depositions of doctors, hospitals, first responders, the military, government officials, and others. Here, it simply proves OAG's point that the border crisis is serious. As a matter of law, the importance of the issue before us justifies a pre-suit deposition that might be unavailable in other contexts.

## B. The corporation's inadequate records

Rule 192.4(a) also limits discovery if the information sought "is obtainable from some other source that is more convenient, less burdensome, or less expensive."[16] OAG tried another source by pursuing a visitorial examination of the corporation's records under the Texas Business Organizations Code.[17] But its documents were so few and incomplete that they did not begin to answer OAG's inquiry about efforts to screen those it served for lawful entry into the country.

OAG requested corporate business records reflecting (1) the corporation's

---

[15]     *See, e.g., In re ExxonMobil Corp.*, 635 S.W.3d 631, 635 (Tex. 2021) ("And as to proportionality, ExxonMobil's requests are not unduly burdensome considering the high stakes in this case.").

[16]     TEX. R. CIV. P. 192.4(a).

[17]     *See generally* TEX. BUS. ORGS. CODE § 12.151–.156.

written policies, procedures, and training to ensure that staff and volunteers admitted only those processed and released by law enforcement; and (2) its communications with federal, state, and local law enforcement and access each was granted to the corporation's facilities. The 111 pages the corporation produced in response said almost *nothing* about those issues:

(1)    50 pages were from an employee handbook describing generic employment policies like timekeeping, overtime, termination, social media, and a rule that said only citizens and authorized aliens could be *hired* by the corporation, but nothing about those it could *serve*; and

(2)    55 pages showed receipts and deposits of federal funds.

The only mention of efforts to screen those receiving aid were brief and conclusory:

(1)    a single sentence stated summarily, "All immigrants/ Asylum Seekers need to have been processed and released by CBP to be admitted";

(2)    one paragraph stated summarily that the corporation had a "working relationship" with law enforcement to provide "a secure space for immigrants/refugees" and "assist with immediate care"; and

(3)    a single sentence on an otherwise blank page stated summarily, "CBP and ICE also agreed to notify CCRGV of the number and time of individuals being dropped off."

Nothing here responds to the issues raised by OAG's petition. None say what the corporation did to screen out unlawful entrants, who assured the corporation that those it served were lawfully in the U.S., or whether law enforcement had access to the corporation's facilities frequently, occasionally, or never. Besides being brief and conclusory, these sentences bear no hallmarks showing they were prepared in the ordinary course of business; each was prepared solely to send to OAG.[18]

---

[18]    TEX. R. EVID. 803(6), 902(10).

This absence of corporate records cannot be written off as a lack of funding. Though intermittent and haphazard, the existing records show the corporation received federal funds of over $10 million in September of 2021, $6 million more in the first half of 2022, and over $10 million again in the first half of 2023. Nothing on the face of these records indicates they were not critically needed or effectively spent. But for an agency handling so many people and such large amounts of money in a major crisis, the benefit of getting answers under oath that the corporate documents do not supply outweighs the burden of an oral deposition.

The corporation laments the burden a pre-suit deposition would place on the organization's religious practice and service. But relegating OAG to some other form of investigation like surveillance of its activities or interviews by law enforcement of its clients—many with limited knowledge of U.S. language or laws or fear of contact with state officers—is almost certain to be more disruptive of the corporation's humanitarian work than deposing one of its executives. As a matter of law, the benefit of a pre-suit deposition outweighed the burden because no more convenient or less burdensome source of information was at hand.

## C. The Court's opinion overlooks these factors

The Court's opinion ignores all this context for two reasons.

*First*, the Court disregards the border crisis because OAG did not introduce all 55 disaster declarations, or ask the trial judge to take judicial notice of them. But that evidence was right in front of him: a letter from the Governor of Texas noting "the ongoing border crisis," that the "number of illegal immigrants crossing the Texas-Mexico border has reached an all-time high," and "calling on the Texas Attorney General's Office to initiate an investigation into the role of NGOs[19] in

---

[19]     Non-governmental organizations like the corporation at issue here.

planning and facilitating the illegal transportation of illegal immigrants across our borders." Which part of this letter, plainly in evidence, did the trial judge have discretion to *disbelieve*?

Requiring a trial judge to take notice of what is happening all around him is hardly unprecedented. Texas appellate courts routinely do so,[20] taking judicial notice of facts that are *not* in the appellate record if they are "generally known within the trial court's territorial jurisdiction or can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." TEX. R. EVID. 201(b).[21] The border crisis was "generally known" in Hidalgo County where the trial court is located, and the accuracy of the Governor's 55 disaster declarations "cannot reasonably be questioned." Sitting less than 20 miles from the Rio Grande, the trial court here had no discretion to ignore this context.

Nor can we. We do not decide cases from an ivory tower. This Court was created for "cases that implicate the State's interests."[22] We cannot review the benefits and burdens of this pre-suit deposition by ignoring what the State's chief executive and its chief attorney were trying to do. In general, their constitutional "investigative authority must be accommodated,"[23] and we must consider "the priorities of the other branches of Texas government."[24]

---

[20]     *See* TEX. R. EVID. 201(d) (noting that courts "may take judicial notice at any stage of the proceeding.").

[21]     *See, e.g., Univ. of Houston v. Barth*, 403 S.W.3d 851, 856 (Tex. 2013) (Board of Regents policies); *Freedom Communications, Inc. v. Coronado*, 372 S.W.3d 621, 623 (Tex. 2012) (plea agreement in federal court); *Van Dyke v. Navigator Group*, 668 S.W.3d 353, 363 (Tex. 2023) (estate-misconception theory that 1/8 was standard royalty); *CenterPoint Energy Res. Corp. v. Ramirez*, 640 S.W.3d 205, 210 (Tex. 2022) (terms of utility's tariff).

[22]     *In re Dallas Cnty.*, 697 S.W.3d 142, 146 (Tex. 2024).

[23]     *In re Tex. House of Reps.*, 702 S.W.3d 330, 340 (Tex. 2024).

[24]     *In re Gulf Expl., LLC*, 289 S.W.3d 836, 842 (Tex. 2009); *see also Tex. Mut. Ins. Co. v. Ruttiger*, 381 S.W.3d 430, 451 (Tex. 2012).

*Second*, the Court adopts a strict construction to keep Rule 192 from Rule 202, holding that the incorporation in Rule 202.5 of the "scope of discovery" in Rule 192.4 does not apply to *whether* a pre-suit deposition should be taken but only *how much* it should cover. But the term "scope of discovery" is not so limited; Black's Law Dictionary defines it as: "The limits within which a court allows litigants to employ pretrial procedures."[25] *Whether* to allow a pre-suit deposition is one of those limits, not just how much it can cover. Rule 202 says that a trial court "*must order*" a pre-suit deposition if the benefit outweighs the burden; that is simply the obverse of Rule 192 which says that all discovery methods "*should be limited*" if the burden outweighs the benefit. They are two sides of the same coin. They cannot be different tests because they say the same thing.

## II.     No adequate remedy

The parties agree that if the trial court abused its discretion in denying the Rule 202 deposition, mandamus is the "appropriate vehicle for seeking review." Rule 202 orders are interlocutory rather than final, and no statute provides for an interlocutory appeal.[26]

## Conclusion

Whether the OAG's inquiry is well-founded or a waste of time is not before us; the only issue here is whether the benefits outweigh the burdens of a Rule 202 deposition in the unique circumstances of a public safety and humanitarian crisis that OAG was expressly tasked with investigating for illegal activity, and a charitable corporation whose meager books and records make it hard to tell. In these

---

[25]     *See Scope of Discovery*, BLACK'S LAW DICTIONARY at 1619 (12th ed. 2024).

[26]     *In re Jorden*, 249 S.W.3d at 419 (noting also that appeal from a final judgment would be inadequate because "it is hard to imagine how allowing discovery a little too early could ever be harmful error").

circumstances, the trial court abused its discretion in denying OAG's petition for a pre-suit deposition. Because the Court holds otherwise, I respectfully dissent.

/s/Scott Brister

Scott Brister
Chief Justice

Panel consists of Chief Justice Brister and Justices Field and Farris.